[No. A097383. First Dist., Div. Five. Dec. 19, 2002.]

PAULA R. ZINNEMANN, as Real Estate Commissioner, etc., Plaintiff and Respondent, v.
VENANCIO A. BAGNOL et al., Defendants and Appellants;
JOHN J. ALLISON et al., Defendants and Respondents.

**COUNSEL**

Gerald R. Barrick for Defendants and Appellants.

Bill Lockyer, Attorney General, Randall P. Borcherding and Julian O. Standen, Deputy Attorneys General, for Plaintiff and Respondent.

Lundell & Spadafore and Timothy A. Lundell for Defendants and Respondents.

**OPINION**

**SIMONS, J.**—The Real Estate Recovery Program (Bus. & Prof. Code,[1] § 10470 et seq.) allows persons who have been defrauded by a real estate licensee to recover from a state monitored account, funded from real estate license fees (the Recovery Account). To be eligible to recover, an applicant must have obtained a final judgment against the licensee for fraud or conversion of trust funds arising directly from a transaction in which the

---

[1] All undesignated section references are to the Business and Professions Code.

licensee performed acts for which a license was required, and the judgment must not have been discharged in bankruptcy. (§ 10471, subds. (a) & (c)(7)(F).) The maximum amount payable to claimants against any particular licensee is limited to $100,000. (§ 10474.) When multiple claimants seek more than this amount, the Real Estate Commissioner (the Commissioner) must file an action for determination of the prorated share to be distributed to each claimant. (§§ 10471.6, 10474.5.) This appeal arises from such an action. Appellants are one group of claimants (the Bagnol Group) who contend that the trial court erroneously determined that a second group (the Allison Claimants) was eligible to share in the recovery, reducing the Bagnol Group's portion. The trial court permitted the Allison Claimants to rely on a judgment against a licensee that had been previously discharged in bankruptcy, because the bankruptcy court had ruled that this judgment was not discharged for the limited purpose of "obtain[ing] recovery from the real estate recovery fund." We conclude that such a judgment does not constitute the requisite personal judgment against a licensee and reverse the order directing payment.

## THE LEGAL FRAMEWORK

To obtain funds from the Recovery Account, a claimant must submit an application to the Commissioner for payment of the amount left unpaid on a judgment. (§ 10471.) The decision to grant or deny the application lies with the Commissioner, but a claimant whose application has been denied may seek from the court that rendered the judgment an order directing payment out of the Recovery Account. (§§ 10471.3, 10472, 10473.) If the Commissioner determines that the liability of the Recovery Account appears to be insufficient to pay in full all valid claims against a single licensee, then the Commissioner must file a proration proceeding in court, and the court must determine how the funds are to be distributed. (§§ 10471.6, 10474.5.) Generally, the funds are to be distributed among the claimants in proportion to the ratio that each claim bears to the aggregate of all claims, but the court retains the authority to employ any other equitable method of distribution. (§ 10474.5.)

## FACTUAL AND PROCEDURAL BACKGROUND

During the 1980's, George Albert Barber, George Michael Montross, and their wholly owned real estate company, Montross Barber Investments, Inc. (MBI), syndicated various real estate limited partnerships in the San Francisco Bay Area. Barber, Montross and MBI all held real estate licenses issued by the Department of Real Estate. Montross and Barber misused and converted partnership funds, resulting in financial losses for the investors. Both Barber and Montross were ultimately convicted of criminal fraud.

The Allison Claimants, who had been limited partners in the Lake Kensington Park project, brought an action in San Mateo Superior Court against Barber, Montross, and MBI for fraud, conversion, and other causes of action. (*Allison v. Montross* (Super. Ct. San Mateo County, 1993 & 1999, No. 369097).) The Allison Claimants obtained default judgments against Montross and Barber in 1993. That same year, Montross filed for bankruptcy, and in 1994 the Allison Claimants obtained a fraud judgment against him from the bankruptcy court that was declared to be nondischargeable. Barber filed for bankruptcy and received an order of discharge in 1995.

In 1994 the Allison Claimants submitted an application to the Commissioner for payment from the Recovery Account for their losses caused by Montross, Barber, and MBI. Other groups of defrauded investors filed similar applications, and still other groups had outstanding lawsuits, bringing the aggregate claims against the licensees to millions of dollars. In 1997 the Commissioner initiated a proration proceeding in San Francisco Superior Court to obtain a judicial determination of how the $100,000 account for each licensee should be divided.[2]

Initially, the Commissioner sought proration based on the assumption that each investor had a judgment against both Barber and Montross. The Commissioner's motion for summary judgment and for an order directing payment was opposed by a group of investors in the Sunnyside Terrace Estates project (the Bagnol Group). The Bagnol Group argued that the Recovery Accounts for Barber and Montross should not be aggregated, that recovery from the Recovery Account for Barber should be limited to those claimants who actually have a valid judgment against Barber, and that the Bagnol Group was then in litigation to obtain such a judgment. The Commissioner then withdrew its motion as no longer ripe for decision and further agreed with the Bagnol Group that applicants could recover only if they had a judgment against the licensee.

In February 1999 the Bagnol Group obtained a judgment from the bankruptcy court, finding Barber liable for fraud and conversion in the amount of $431,000 and declaring such judgment nondischargeable. The Bagnol Group then submitted an application for payment from the Recovery Account for Barber, asserting that it was the only group of claimants with a judgment against Barber, that all other claims had been discharged in Barber's bankruptcy in 1995.

In October 1999 the Commissioner moved for an order determining eligibility to participate in the Recovery Account proration. With respect to

---

[2]The license for MBI is not subject to recovery.

the Recovery Account for Barber, the Commissioner asserted that the eligible applicants were the Allison Claimants and the Bagnol Group. The Bagnol Group objected to the eligibility of the Allison Claimants, arguing, among other things, (1) that the 1993 default judgment obtained by the Allison Claimants against Barber was a clerk's judgment that could not have been based on fraud and (2) that the 1993 judgment had been discharged in Barber's 1995 bankruptcy.

In response to this challenge, the Allison Claimants asserted that they had never received notice of Barber's bankruptcy. They also impliedly acknowledged the defect in the clerk's default judgment, and they returned to the San Mateo Superior Court and applied for a new default judgment against Barber by the court. After a hearing to establish damages, the San Mateo Superior Court entered a default judgment in November 1999 in favor of the Allison Claimants and against Barber for $943,113 plus interest based on fraud and breach of fiduciary duty.[3]

Within the proration proceeding, the Commissioner then argued that the 1999 replacement judgment satisfied the requirements for recovery by the Allison Claimants. The Bagnol Group objected, asserting that the 1999 judgment was a subterfuge to get around the bankruptcy discharge. The trial court ruled, however, that both the Allison Claimants and the Bagnol Group were entitled to a pro rata distribution from Barber's Recovery Account. The court directed the Commissioner to ascertain the identities of the persons eligible, to compute the pro rata share of each claimant, and to apply to the court for approval of the proposed proration.

The Bagnol Group moved for reconsideration, arguing that the new 1999 judgment did not qualify the Allison Claimants for recovery. The Bagnol Group presented a copy of the schedule of creditors filed in Barber's 1995 bankruptcy, showing the Allison Claimants listed as unsecured creditors. The motion for reconsideration was denied. The Bagnol Group appealed the order determining eligibility, but we held the appeal was premature as no final order of proration had yet been entered. (*Zinnemann v. Bagnol* (Mar. 22, 2001, A089756) [nonpub. opn.].)

Meanwhile, Barber moved in the San Mateo Superior Court to declare the 1999 default judgment void on the ground that the initial 1993 judgment had been discharged in bankruptcy. The Allison Claimants removed the matter to the bankruptcy court for decision on that motion, and the matter was dropped

---

[3]Barber appealed from that judgment and we affirmed. (*Allison v. Barber* (Mar. 22, 2001, A089663) [nonpub. opn.].) We concluded that the 1993 clerk's judgment was void and that the 1999 replacement judgment was proper.

from the superior court calendar. On August 8, 2000, during the pendency of the previous appeal, the bankruptcy court denied Barber's motion and ruled that the 1999 judgment had not been discharged in bankruptcy for purposes of allowing recovery from the Recovery Account.[4]

Also while the previous appeal was pending, the trial court determined the pro rata payment to be made to the numerous applicants from the Recovery Account for Montross. The Allison Claimants received a total of $23,709.10 (to be allocated among the 36 claimants).

Once this court dismissed the appeal of the Bagnol Group, the Commissioner sought an order for payment to the Allison Claimants and the Bagnol Group from the Recovery Account for Barber. The Bagnol Group opposed the motion, arguing, in part, that the Allison Claimants were ineligible for recovery as their claims had been discharged in bankruptcy. The trial court ordered pro rata payment from the Barber Recovery Account of $62,895.62 to the Allison Claimants and $37,104.38 to the Bagnol Group. The Bagnol Group now appeals.

### DISCUSSION

In the previous appeal by the Bagnol Group, we held that the trial court's order determining eligibility was not a final order and the appeal was premature. Now that a final order of pro rata payment has been entered, we may properly review the trial court's determination of the Allison Claimants' eligibility to participate in a distribution from Barber's Recovery Account.

Section 10471 allows a person defrauded by a real estate licensee to recover from the Recovery Account only if the applicant has obtained a personal judgment against the licensee that has not been discharged in bankruptcy. (See generally *Armenta v. Edmonds* (1988) 201 Cal.App.3d 464

---

[4]The Bankruptcy Code provides that a discharge in bankruptcy "voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged . . . ." (11 U.S.C. § 524(a)(1).) However, the discharge of a debt "does not affect the liability of any other entity on, or the property of any other entity for, such debt." (11 U.S.C. § 524(e).)

The bankruptcy court ruled as follows on Barber's motion to void the 1999 judgment: "the 1999 judgment against Barber was obtained solely to obtain recovery from the real estate recovery fund, a judgment for such purpose is not barred by 11 U.S.C. § 524, and the Superior Court on remand can amend its judgment to provide clearly that the effect of the judgment is so limited." In the previous appeal, we remanded the matter to the San Mateo Superior Court for such amendment.

[247 Cal.Rptr. 204].) The Bagnol Group argues that the Allison Claimants are ineligible to recover because their 1993 default judgment against Barber was discharged in the 1995 bankruptcy and the 1999 replacement judgment was a judgment obtained solely for recovery from the Recovery Account and was not a judgment "against a defendant." (§ 10471, subd. (a).) We agree.

The Legislature added the bankruptcy discharge qualification in 1987 in order to protect the Real Estate Recovery Program from "claims which have exceeded the intended purpose of the program, in certain cases brought by claimants who have employed judicial procedures designed solely to assure access to the Recovery Account." (Stats. 1987, ch. 535, § 1(d), p. 1830.) In particular, the Legislature added subdivision (c)(7)(F) to section 10471, requiring that the applicant declare that "the underlying judgment and debt have not been discharged in bankruptcy, or, in the case of a bankruptcy proceeding that is open at the time of the filing of the application, that the judgment and debt have been declared to be nondischargeable."[5] (Stats. 1987, ch. 535, § 3, p. 1831.) Further, the Legislature required that the application form include "a notice to the applicant of his or her obligation to protect the underlying judgment from discharge in bankruptcy." (§ 10471, former subd. (d), now subd. (e).)

We discern at least two purposes served by imposing these eligibility requirements. First, as long as the judgment has not been discharged in bankruptcy the possibility remains of future repayment to the Recovery Account from the licensee through subrogation.[6] (§ 10479.) Second, when the licensee remains potentially liable for repayment, the risk is reduced of collusive judgments obtained solely for the purpose of qualifying for the Recovery Account. (See generally *Yergan v. Department of Real Estate* (2000) 77 Cal.App.4th 959, 969 [92 Cal.Rptr.2d 189].)

---

[5]In 2001 the Legislature further amended section 10471, subdivision (c)(7)(F) to include a bankruptcy proceeding commenced *after* the filing of an application to the Recovery Account.

[6]Whenever a claim is paid from the Recovery Account, the licensee's license is suspended and cannot be reinstated until the licensee has reimbursed the Recovery Account. (§ 10475.) By statute, the discharge in bankruptcy does not relieve the licensee of the obligation to repay the Recovery Account. (§ 10475.) However, a federal appellate court has held that a similar Utah statute violates the "fresh start" purposes of the bankruptcy laws. (*In re Walker* (10th Cir. 1991) 927 F.2d 1138, 1142-1143; but see *In re Turner* (Bankr. 9th Cir. 1996) 199 B.R. 694 [no bankruptcy discrimination in requiring reimbursement prior to license reinstatement].) Since the record does not suggest that Barber wants his license reinstated, the only chance for reimbursement to the Recovery Account seems to lie in the Commissioner's subrogation to the claims of the judgment creditors.

■ In the present case, the Allison Claimants had a statutory obligation to protect their 1993 judgment from discharge in Barber's 1995 bankruptcy.[7] They could have accomplished this by obtaining a nondischargeable fraud judgment from the bankruptcy court, as they did with Montross. Instead, they obtained a belated replacement default judgment in state court and then a declaration from the bankruptcy court that, although that judgment could not be asserted against Barber personally, it could still be used to recover from the Real Estate Recovery Program. (See fn. 4, *ante*, p. 662.) In our view, the Allison Claimants cannot, through such postbankruptcy maneuvering, circumvent the requirement that the licensee remain personally liable on the judgment.

■ We recognize, of course, that the bankruptcy court has exclusive jurisdiction to determine the nondischargeability of debts based on fraud (11 U.S.C. § 523(c)(1); 28 U.S.C. § 157(b)(2)(I); *Harris v. U.S. Fire Ins. Co.* (Bankr. E.D.Va. 1994) 162 B.R. 466) and is authorized to issue declarations permitting a creditor to proceed against a state's real estate recovery program while insulating the debtor from personal liability. (*In re Walker, supra*, 927 F.2d at p. 1142, and cases cited therein.) Whether such a decision achieves its intended result and qualifies the creditor to participate in the California Real Estate Recovery Program is, however, a determination properly made by this court. ■ Nothing in our decision impinges upon the bankruptcy court's determination concerning Barber's personal liability for the 1999 judgment. In fact, we are simply applying this determination to our own determination of the Allison Claimants' eligibility under section 10471. We conclude that because Barber no longer has any personal liability on the San Mateo Superior Court judgment, the Allison Claimants do not qualify for participation in the Recovery Account for Barber.

The Allison Claimants asserted below that because they never received notice of the bankruptcy proceeding they were obligated only to reopen the

---

[7]On appeal, the Allison Claimants and the Commissioner argue that the Bagnol Group failed to present authenticated evidence below that the Allison Claimants' claims had been discharged in Barber's 1995 bankruptcy. This argument is wholly specious.

At the most recent hearing in the proration proceeding, counsel for the Bagnol Group was granted leave to file a certified copy of the bankruptcy discharge order. The trial court acknowledged that it had received and considered the bankruptcy discharge order: "I know that there is bankruptcy."

Indeed, the Bagnol Group consistently asserted the 1995 bankruptcy discharge beginning in its initial application and continuing through its oppositions to the Commissioner's motions for payment. At no time did the Allison Claimants or the Commissioner dispute the discharge in bankruptcy. (In fact, within the San Mateo Superior Court action, the Allison Claimants removed the matter to federal court for decision on Barber's motion to vacate the 1999 default judgment, asserting that Barber had obtained a discharge in bankruptcy unbeknownst to the Allison Claimants.)

bankruptcy case and obtain a nondischargeable judgment from the bankruptcy court. The Commissioner has argued that the Allison Claimants should not be faulted for avoiding the legal fees required to take those extra legal steps and that allowing the Allison Claimants to participate despite the bankruptcy discharge falls within the trial court's authority to make an "equitable" distribution of the Recovery Account. (§ 10474.5.) The Commissioner argued to the trial court: "This court should allow some [latitude] to ensure that the [Recovery] Account's liability is prorated 'equitably' . . . ."

The Commissioner's argument fails to distinguish between a determination of eligibility to participate in the Real Estate Recovery Program and a determination of the amount of proration. The trial court's statutory power to make an "equitable" distribution pertains to the *amount* of proration. Such pro rata payment is authorized only to aggrieved persons with "valid claims." (§ 10474.5.) Although the Real Estate Recovery Program is intended to protect the public and should be liberally construed in favor of the victims, nonetheless the statutory eligibility requirements cannot be ignored. (*Davis v. Harris* (1998) 61 Cal.App.4th 507, 512 [71 Cal.Rptr.2d 591]; *McGaughey v. Fox* (1979) 94 Cal.App.3d 645, 651 [156 Cal.Rptr. 593].) The trial court's obligation to be equitable extends only to those eligible to participate. In the absence of a personal judgment against Barber, the Allison Claimants are not eligible to participate in the Recovery Account.[8]

■ The Allison Claimants further argued below and reiterate on appeal that their eligibility should be assessed as of the date of their 1994 application, at which time Barber had not yet filed for bankruptcy. The Allison Claimants contend that they fulfilled the statutory requirements because they accurately stated in their application that their judgment against Barber had not been discharged in bankruptcy.

The argument is not persuasive. The intent of the Legislature in section 10471, subdivision (c)(7), in requiring certain "representations and information from the claimant" was to impose conditions of eligibility, not simply to require certain statements on the application form. The statute imposes an obligation on the claimant to "protect" the judgment from discharge in

---

[8]The Allison Claimants mistakenly rely on a case arising before the 1987 amendments in which the court held that a judgment discharged in bankruptcy could form the basis for recovery from the Recovery Account "[e]ven though [the broker] might not be personally liable for the discharged debt." (*Rogers v. Edmonds* (1988) 200 Cal.App.3d 1237, 1241 [248 Cal.Rptr. 15].) In that case, the court concluded that the 1987 bankruptcy discharge amendments would not be applied retroactively and, hence, that the claimant, who could have obtained a declaration of nondischargeability from the bankruptcy court, was eligible for recovery. Here, in contrast, the 1987 amendments plainly apply and preclude recovery without a declaration of nondischargeability.

bankruptcy, indicating that the claimant must take appropriate steps in the event of a subsequent bankruptcy. (§ 10471, subd. (e).) By its 2001 amendment to section 10471, subdivision (c)(7)(F) (see fn. 5, *ante*, p. 663), the Legislature clarified that an applicant is ineligible even if the bankruptcy occurs *after* the application is filed.[9] Indeed, the salutary purposes we have already identified that are served by the bankruptcy disqualification would be defeated if the licensee's subsequent bankruptcy was inconsequential to the claimant's recovery.[10]

## DISPOSITION

The order directing payment from the Barber Recovery Account is reversed, and the matter is remanded for entry of an order excluding the Allison Claimants from participation. Costs on appeal are awarded to appellants.

Stevens, Acting P. J., and Gemello, J., concurred.

---

[9] The 2001 amendment to subdivision (c)(7)(F) of section 10471 was part of a bill sponsored by the Department of Real Estate to make "technical and clarifying changes" in the application procedures for the Recovery Account. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 795 (2001-2002 Reg. Sess.) as amended Apr. 16, 2001, pp. 1, 4; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 795 (2001-2002 Reg. Sess.) as amended Apr. 16, 2001, p. 6.)

[10] Because of our decision to reverse on this basis, we need not reach the host of other arguments raised by the Bagnol Group.