[No. B119816. Second Dist., Div. Four. Jan. 25, 2000.]

VARTANUSH YERGAN et al., Plaintiffs and Appellants, v.
DEPARTMENT OF REAL ESTATE, Defendant and Respondent.

## COUNSEL

Shafron, Altschuld & Kammer, Shelly Jay Shafron and John P. Garcia for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, David S. Chaney and Raymond B. Jue, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

CURRY, J.—Appellants Vartanush Yergan and Ardem Vartanian appeal from the trial court's judgment in favor of respondent the Department of Real Estate (Department) on their claim for entitlement to payment under the Real Estate Recovery Program (Bus. & Prof. Code, § 10470 et seq.).[1] The Department denied appellant's claim, and the trial court concurred, on the ground that the underlying judgment obtained against defendant, REM Westfield, Inc. (REM), a licensed real estate corporation, was not based on fraud, but on professional negligence and breach of duty. We affirm.

### BACKGROUND FACTS

Appellants Yergan and Vartanian are sisters. Through Yergan's daughter, they became acquainted with Vartevar "Varto" Mazmanian, a licensed real estate agent and broker. According to stipulated facts,[2] Mazmanian was a licensed real estate salesperson since 1985. In May 1987, he went to work for Dorn-Platz & Co. In 1989, he was terminated from Dorn-Platz's employ and formed his own company, REM, which was a licensed real estate corporation until its license expired in February 1994.

At the time they met Mazmanian, appellants jointly owned an apartment building located on Afton Place in Los Angeles, California.[3] Vartanian lived in one of the apartments. Appellants consulted with Mazmanian about selling the Afton Place property in 1987 or 1988, while he was still employed by Dorn-Platz. Mazmanian convinced them that they could "multiply [their] money" by using the proceeds from the sale of the apartment to buy and sell other properties.

In early 1988, appellants signed an agreement with Mazmanian and his wife, Raya, which appointed them as "accommodators" in a tax-deferred exchange. Escrow closed on the apartment building in June of 1988. Yergan netted $237,000 in cash, which she left with Mazmanian to invest. Vartanian

---

[1] All statutory references herein are to the Business and Professions Code.

[2] The parties stipulated that "each and every statement and fact" set forth in appellants' "Verified Application For an Order Directing Payment Out of the Recovery Account" would be "deemed true and accurate for the trial pertaining to the Verified Application and any appeal pertaining to the Verified Application" and that the documents attached to the Verified Application and/or filed with the Department were true and correct copies of the originals.

[3] Yergan owned a two-thirds interest in the property while Vartanian owned one-third.

netted $128,500, took out $48,500, and left the remaining $80,000 with Mazmanian, also for him to invest on her behalf.[4]

Yergan's funds were initially invested in five properties:[5] (1) a residence at 401 Allen Avenue, (2) a duplex at 405 Allen Avenue, (3) an apartment building on West Valencia Avenue, (4) a gas station on North Pacific Avenue, and (5) a residence on Hill Drive.[6] Vartanian's more limited funds were put into two of these properties: the one on West Valencia Avenue and the one at 405 Allen.[7] Mazmanian and Dorn-Platz earned substantial commissions on at least some of these transfers.

In 1990, the Allen properties were sold or exchanged, and appellants' proceeds reinvested in a property on East Broadway.[8] The commission on this transfer went to REM. The East Broadway property went into foreclosure in 1991 or 1992, and appellants lost their investments—$149,175 attributed to Yergan and $83,533 attributed to Vartanian.

In 1989, the West Valencia property was sold for a small profit to another investment group which included Mazmanian, but it is not clear from the stipulated facts whether appellants obtained any proceeds from this sale.[9] Dorn-Platz and Mazmanian earned a $70,000 commission.

Also in 1989, the North Pacific gas station was exchanged for another property on Windsor Avenue. Mazmanian and Dorn-Platz again earned substantial fees and commissions from the transfer. According to the escrow documents, Yergan was to receive proceeds of $21,000, but the funds were not paid to her. The Windsor property was ultimately taken by the lender

---

[4]One of Vartanian's claims is that Mazmanian did not advise her of the tax consequences of taking out cash proceeds.

[5]The properties were not solely owned by appellants. There were other investors involved, including Ara Artinian, who later became a codefendant in appellants' lawsuit against Mazmanian, Dorn-Platz, and REM.

[6]The total invested in these properties was $232,456, leaving a balance due to Yergan of $4,565. According to the stipulation, she never received these funds.

[7]Vartanian was similarly entitled to a refund of $3,875 due to the difference between the amounts invested in the properties and the $80,000 given to Mazmanian for investment, which she did not receive.

[8]The Allen properties were sold to groups in which Mazmanian had an interest. One of appellants' complaints was that the 405 Allen property was resold to third parties shortly after the transfer from appellants for an additional profit. Another complaint is that the East Broadway property was purchased from another group in which Mazmanian held an interest at an inflated price compared to the price which had been paid by that group a few months earlier. The transfer documents showed a gain of $20,276 for Yergan on the 401 Allen property, and a gain of $17,117 each for appellants on the 405 Allen property.

[9]According to REM, Vartanian withdrew $10,000 cash after the sale of the West Valencia property, and the remaining profit was invested in the East Broadway property.

through foreclosure. Yergan lost her investment funds, which totaled $145,141.

In March of 1989, a property was acquired on West Verdugo Road with Yergan as one of the buyers, along with the Mazmanians and some others.[10] That property was lost in foreclosure, wiping out Yergan's $58,000 investment.

Appellants also established per the stipulated facts that Mazmanian, in the guise of manager, misused and converted rental moneys and other income earned by certain of the buildings prior to foreclosure. When these funds were added to the lost investment money, undisclosed commissions, and secret profits, Yergan's damages totaled $489,000. Vartanian's totaled $123,606.

## PROCEDURAL BACKGROUND

### Underlying Complaint and Settlement Agreement

In November of 1991, appellants brought a complaint against Mazmanian, his wife Raya, Dorn-Platz, REM, a partnership called Jackson Executive Group, and Ara Artinian. The complaint and first amended complaint alleged causes of action for breach of fiduciary duty, fraud and deceit, negligent misrepresentation, negligent and intentional infliction of emotional distress, and fraudulent conveyance.

In July of 1993, the parties entered into a settlement agreement.[11] The settlement agreement stated in its recitals that appellants had "filed suit . . . alleging various causes of action and claims for professional negligence and breach of [fiduciary] duty" and that the parties desired "to fully compromise, settle and resolve all of the claims, rights, indebtedness, and liabilities among them, to settle and dismiss the Civil Action as to all parties except REM . . . ." As for the case against REM, the agreement provided it "is settled herein," but would not be dismissed "until [REM's] full payment as set forth herein is received by [appellants]."

Under the settlement agreement, "defendants" agreed to pay $400,000 to appellants by July 16, 1993. It also included the following "Additional Obligation Of REM": "In settlement of all claims for professional negligence and breach of duty against [REM], REM agrees to pay [appellants] the

[10]Although the stipulated facts do not so state, REM contended that the money used to purchase the Verdugo Road property came from the sale or transfer of the Hill Drive property.

[11]Parties to the settlement agreement included, besides the named defendants, Raya Mazmanian and Donald Platz. Platz had apparently been added to the lawsuit at some point as a Doe.

sum of Fifty Thousand Dollars ($50,000) on or before October 1, 1993."[12] If REM failed to pay by the deadline, "then at any time thereafter, without notice, [appellants] may enter judgment in the sum of Fifty Thousand Dollars ($50,000) plus accrued interest until paid in full against REM pursuant to and in accordance with the Stipulation for Entry of Judgment . . . executed concurrently with this Settlement Agreement."

The settlement agreement contained a standard release clause, releasing all parties from claims, demands, damages, debts, compensation, etc., which accrued as of the date of the agreement "arising from or incident to" the allegations contained in the underlying complaint. Specifically excluded from the release was "REM as to its payment obligation set forth herein, the judgment that may be entered against REM pursuant to this Agreement and the Stipulation for Entry of Judgment and all rights, and causes of action by which the judgment may be enforced or collected . . . ."

The parties also agreed that the compromise and settlement "shall constitute a bar to the assertion of any [claims arising from or incident to the allegations contained in the underlying complaint]." Again there was an exclusion for "REM's obligations hereunder and the Stipulation for Entry of Judgment executed concurrently herewith, or judgment entered thereby, and any post-entry-of-judgment rights or causes of action to enforce and/or collect on the judgment."

The settlement agreement also contained standard language to the effect that "this Agreement is a compromise of disputed claims, and . . . the payment thereof is not, in any manner, to be construed as an admission of liability of the persons, firms or corporations that are parties to this Agreement, or any of them, by each of whom liability is expressly denied and controverted."

The attached stipulation for judgment which was to be filed if REM did not pay provided: "REM acknowledges and agrees that it is indebted to [Yergan] in the sum of $37,500 plus interest thereon at the rate of 10% per annum from and after June 16, 1993 plus costs and reasonable attorneys' fees and, subject to the terms hereof, it consents to the entry of a Final Judgment in the above-entitled action in favor of [Yergan] and against REM on the Complaint for such sum. REM acknowledges and agrees that it is indebted to [Vartanian] in the sum of $12,500 plus interest thereon at the rate of 10% per annum from and after June 16, 1993 plus costs and reasonable attorneys' fees, and subject to the terms hereof it consents to the entry of a Final Judgment in the above-entitled action in favor of [Vartanian] and against REM on the. Complaint for such sum."

---

[12]The sum was to be divided as follows: $37,500 to Yergan and $12,500 to Vartanian.

*Judgment and Application for Recovery Account Payment*

REM did not pay the $50,000. On October 27, 1993, judgment was entered in favor of appellants and against REM pursuant to the stipulation. In the judgment, Yergan was awarded $37,500 plus interest of $1,364.58. Vartanian was awarded $12,500 plus interest in the amount of $454.85.

Appellants made application to the Department for recovery of these sums in October of 1994. In November of 1994, the Department sought additional information relating to certain topics, including whether REM's culpability was based on vicarious liability or negligent supervision only and why Raya Mazmanian and Ara Artinian were released without having made any contribution. Appellants submitted a letter in response in December of 1994.

The Department issued its final ruling denying the claim on April 21, 1995. The following reasons were given: "The judgment is not based upon the judgment debtor's fraud, misrepresentation, or deceit, made with the intent to defraud, or conversion of trust funds which is a mandatory prerequisite to payment from the Recovery Account . . . . The settlement agreement provided that the agreement was a compromise of disputed claims and that payment could not be construed as an admission of liability of the parties to the agreement. Further, pursuant to the agreement, judgment debtor was to pay claimants the sum of $50,000 in settlement of all claims for professional negligence and breach of duty. . . . The underlying judgment is a result of debtor's breach of the settlement agreement, not a result of a final adjudication of the allegations in the complaint. Moreover, the settlement agreement explicitly states that it is a resolution only of claims based on breach of duty and professional negligence. Neither of those causes of action is a basis for payment from the Recovery Account."

*Proceedings in the Trial Court*

Appellants filed a verified application for order directing payment out of the recovery account. As we have seen, the parties stipulated to the underlying facts as set forth in the application. In addition, the parties stipulated that appellants had complied with necessary procedural requirements for making a claim on the recovery account, and that "as to the entire dispute between said parties the only issue in dispute is whether [appellants'] underlying Judgment was based upon fraud, misrepresentation, or deceit, made with intent to defraud, or conversion of trust funds as stated in California Business and Professions Code section 10471(a) and interpreted by case law."

After extensive briefing of this issue, and oral argument, the trial court ruled in favor of the Department. This appeal followed entry of judgment on the trial court's order.

DISCUSSION

■ The recovery account is a fund administered by the Department. Its purpose is to satisfy certain types of judgments against licensed real estate brokers and agents as defined in the Real Estate Recovery Program (§ 10470 et seq.) when the aggrieved party would otherwise go unpaid. "It has been consistently held that section 10471 is a remedial statute intended to protect the public from loss resulting from unsatisfied damage awards against licensed real estate personnel resulting from their misrepresentation and breach of fiduciary duty. [Citations.]" (*Doyle v. Department of Real Estate* (1994) 30 Cal.App.4th 893, 896 [36 Cal.Rptr.2d 193], italics omitted.) Courts also have said that "it is to be given a liberal construction to promote its purpose and protect persons within its purview. [Citation.] As such, it has been held that relief will be granted under section 10471 unless to do so is clearly forbidden by statute. [Citation.] '[Section 10471] will be construed when its meaning is doubtful so as to suppress the mischief at which it is directed, to advance or extend the remedy provided, and to bring within the scope of the law every case which comes clearly within its spirit and policy. [Citations.]' " (*Vinci v. Edmonds* (1986) 185 Cal.App.3d 1251, 1256 [230 Cal.Rptr. 308]; accord, *Doyle v. Department of Real Estate, supra,* at pp. 896-897.)

This expansive view is tempered by the remarks of the Legislature which, in 1987, made the following findings and declarations: "(b) The economic vitality of the Real Estate Recovery Program must be protected in order for the program to continue to perform valuable consumer protection functions. [¶] (c) An independent study completed for the Department of Real Estate has determined that, based upon anticipated future program revenues and claims, the Real Estate Recovery Program is now insolvent. [¶] (d) In recent years the Real Estate Recovery Program has been subject to claims which have exceeded the intended purpose of the program, in certain cases brought by claimants who have employed judicial procedures designed solely to assure access to the Recovery Account. [¶] (e) Legislative action is necessary to provide sufficient funding for the Real Estate Recovery Program so that future claims within the intended scope of the program and diligently pursued by aggrieved parties may be paid in a prompt and timely fashion." (Stats. 1987, ch. 535, § 1, pp. 1830-1831.)

With these principles in mind, we proceed with our review of the relevant statutory provisions and the decisions of the Department and the trial court. Section 10471 governs applications to the Department for payment from the recovery account. It states in relevant part: "When an aggrieved person obtains (1) a final judgment in a court of competent jurisdiction, . . . or (2)

an arbitration award . . . against a defendant based upon the defendant's fraud, misrepresentation, or deceit, made with intent to defraud, or conversion of trust funds arising directly out of any transaction . . . in which the defendant, while licensed under this part, performed acts for which that license was required, the aggrieved person may, upon the judgment becoming final, file an application with the Department . . . for payment from the Recovery Account, [within specified monetary limits contained in section 10474], of the amount unpaid on the judgment that represents an actual and direct loss to the claimant in the transaction." (§ 10471, subd. (a).)

As can be seen, the statute speaks in terms of the aggrieved party obtaining a "final judgment" and does not specifically discuss settlements, stipulated judgments, or consent judgments. This created an issue of whether it applied in those situations, which was resolved by the court in *Doyle v. Department of Real Estate, supra,* 30 Cal.App.4th 893. There, a real estate broker settled an action arising out of a real estate transaction and a stipulated judgment was filed. The Department paid the claim, and sought reimbursement from the broker. The broker argued that the Department had exceeded its authority "in granting an application for payment from the recovery account in the absence of the statutorily required judgment based on fraud" and that the statute requires the Department to deny all applications based on stipulated judgments. (*Id.* at p. 897.) The court disagreed, concluding that despite the lack of express reference to stipulated judgments, settlements, and the like, the statute "clearly contemplates that the Commissioner may consider certain underlying facts in determining if the judgment was based on fraud, by providing in part that a claimant must submit an application which includes '[a] detailed narrative statement of the facts in explanation of the allegations of the complaint upon which the underlying judgment is based.' " (*Id.* at p. 898.) The facts which supported the Department's decision in *Doyle* included that the applicants obtained judgment in the full amount sought by the complaint and that the only cause of action in the complaint was for fraud and deceit. (*Id.* at p. 899.) Based on the facts shown, it was clear to the court in *Doyle* "that the Commissioner properly determined that the judgment . . . , though a result of a settlement agreement and stipulation for entry of judgment, is 'based on fraud' as required by section 10471."[13] (*Id.* at p. 899.)

■ We believe this conclusion is also supported by the language of section 10473, governing applications to the superior court for redress where

---

[13]The court in *Doyle* agreed with the Department that the standard disclaimer found in the settlement agreement to the effect that settlement was not intended to be an admission of liability was irrelevant because "[i]t does not . . . 'explicitly rule out this being a fraud judgment.' " (30 Cal.App.4th at p. 899, fn. 4.) We are therefore surprised by the Department's argument that a similar provision contained in the present settlement agreement constitutes a "salient and critical fact . . . ."

a claim for payment from the recovery account has been denied by the Department. Section 10473 provides that "[i]f the judgment in favor of the applicant was by default, stipulation, consent, or pursuant to Section 594 of the Code of Civil Procedure, or whenever the action against the licensee was defended by a trustee in bankruptcy, the applicant shall have the burden of proving that the cause of action against the licensee was for fraud, misrepresentation, deceit, or conversion of trust funds." It stands to reason that if the court is to be permitted to look behind stipulated or consent judgments for evidence of a claim based on fraud in reviewing the Department's decisions, that the Department must have the power to do so in the first instance.

This brings us to the case before us. The stipulation for judgment and the judgment entered did not state the basis for the $50,000 recovery awarded to appellants. The Department looked behind these documents, but only as far as the parties' settlement agreement. The Department refused appellants' invitation to go further and base its decision on the underlying facts tending to establish more serious offenses. The trial court agreed with the Department.

Under the facts presented, we agree with the Department and the trial court. Section 10471 requires "a final judgment in a court of competent jurisdiction, . . . or . . . an arbitration award . . . against a defendant based upon the defendant's fraud, misrepresentation, or deceit, made with intent to defraud, or conversion of trust funds arising directly out of any transaction . . . ." (§ 10471, subd. (a).) Appellants have not met that prerequisite here. The judgment entered was based on the stipulation and the settlement agreement. The settlement agreement specifically stated that the amount REM agreed to pay—and appellants agreed to accept—was "[i]n settlement of all claims for professional negligence and breach of duty . . . ."

Appellants argue that stipulated facts set forth in its application establish the fraudulent actions which formed the primary basis for their claims against REM and the other defendants. Appellants misunderstand their burden under the statutory scheme. The statute does not ask for proof that the applicant had valid *claims* for fraud; the applicant must demonstrate that it has a valid *judgment* for fraud. The determination of the latter issue could very well be resolved by looking at the wording of the judgment itself. Where that fails to resolve the issue, it is appropriate to look behind the judgment at the stipulation or other agreement which led to the judgment. If some ambiguity still remains, the Department (and the court in reviewing the Department's action) might need to look further—as it did in *Doyle*. But

where these documents expressly preclude the possibility that the judgment was based on fraud, the Department is entitled to conclude that the resolution of the underlying claims occurred as set forth in the agreement entered into by the parties.

Appellants argue that this decision goes against the policy in favor of promoting settlements. This overlooks the more germane concern expressed by the Legislature in 1987: that the parties will illicitly "employ[] judicial procedures designed solely to assure access to the Recovery Account." (Stats. 1987, ch. 535, § 1, p. 1830.) A licensee is unlikely to collusively admit fraud in order to pave the way for a recovery account claim, since this would immediately imperil his or her license. He or she might very well admit negligence or breach of duty with the tacit understanding that the claimant will attempt to obtain recovery from the Department sometime in the future. A positive response on the part of the Department to the claimant's application for payment may ultimately have the same negative results as an outright admission of fraud,[14] but the day of reckoning is long postponed. Moreover, there is always the possibility that in later litigation between the Department and licensee for indemnity, the court will side with the licensee. In such situation, the danger of collusive settlements is far greater than the possibility that a claimant will turn down a settlement involving insurance funds in order to preserve a fraud claim which may or may not be covered by the recovery program.[15]

No one disputes that appellants had strong evidence to support their claims of having been defrauded by their agent, Mazmanian, in the purchase and sale of the various properties. However, when it came time to settle, appellants were willing to sacrifice those claims in order to ensure recovery from Dorn-Platz's insurer. That decision was not forced on them—they voluntarily entered into the settlement agreement which limited recovery to the claims for negligence and breach of duty. They were not thereafter foreclosed from presenting evidence that they obtained a recovery based on fraud. They were permitted to put all their evidence in the record before the Department and the trial court, which correctly based their respective decisions on the pertinent documents—the judgment, the stipulation, and the

---

[14]Under section 10475, the license is suspended on the date of payment from the recovery account, and cannot be reinstated until he or she reimburses the recovery account for the amount of the payment, plus interest.

[15]We note that in this case, appellants permitted the individual who reputedly defrauded them, Mazmanian, to settle for negligence and breach of duty—and continue with his real estate career—and are attempting to attribute the fraud solely to a defunct corporation that he controlled.

settlement agreement. The decisions of the trial court and the Department are fully supported by the record, and we affirm them.[16]

## Disposition

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

---

[16]Because we resolve the appeal on the ground that the Department (and trial court) properly relied on the parties' settlement agreement to prove appellants' lack of entitlement to recovery fund payment, we do not consider the Department's contention that res judicata or collateral estoppel provide an alternate ground for affirming its decision.