[No. G045537. Fourth Dist., Div. Three. Aug. 7, 2012.]

JENNIFER WORTHINGTON et al., Plaintiff and Appellant, v.
JEFF DAVI, as Real Estate Commissioner, etc., Defendant and Appellant.

## COUNSEL

Law Firm of David Dunlap Jones and David D. Jones for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Paul D. Gifford, Assistant Attorney General, W. Dean Freeman, Felix E. Leatherwood and Stephen Lew, Deputy Attorneys General, for Defendant and Appellant.

## OPINION

**O'LEARY, P. J.**—Jennifer and Guy Worthington (the Worthingtons) filed a complaint against their real estate broker and several other defendants alleging they were the victims in four fraudulent real estate transactions. The case was arbitrated, and the Worthingtons prevailed. When the Worthingtons discovered the defendants' assets were insufficient to cover the judgment (approximately $280,000), they filed an application with the Department of Real Estate's Consumer Recovery Account (Recovery Account) for payment of the unsatisfied judgment (pursuant to Bus. & Prof. Code, § 10471[1]). The Real Estate Commissioner (the Commissioner) granted part of their application, awarding $50,000 for one of the transactions. The Commissioner denied recovery on the other three transactions on the grounds judgment on those claims was based on breach of the broker's fiduciary duty rather than "fraud, misrepresentation, or deceit" as required by section 10471, subdivision (a).

The Worthingtons filed an application in the superior court for an order directing payment out of the Recovery Account on the remaining three transactions. The trial court, reviewing the issue de novo, determined two of the remaining three transactions involved a breach of fiduciary duty based on intentionally *fraudulent* misrepresentations and therefore must be paid from the Recovery Account. Both the Department of Real Estate (the Department) and the Worthingtons appealed from this ruling, disputing whether all or none

---

[1] All further statutory references are to the Business and Professions Code, unless otherwise indicated.

of the three transactions should qualify for payment from the Recovery Account. We find substantial evidence supports the trial court's judgment. The judgment is affirmed.

I

In the winter of 2006, the Worthingtons filed an amended complaint in the superior court against several defendants, including their real estate agent, Thomas Polander, for breach of contract, fraud, breach of fiduciary duty, and other causes of action.[2] They alleged that in January 2006, Polander solicited them to purchase real estate from his clients. Polander represented he knew of several income properties and he would secure qualified tenants or buyers for any property the Worthingtons purchased. Polander made offers on seven different properties on behalf of the Worthingtons, and "induced" them to refinance their own residence "to obtain lower mortgage payments by representing to [the Worthingtons] that doing so was necessary to qualify [them] to purchase the investment real properties. Accordingly, [the Worthingtons] refinanced their 30-year fixed rate mortgage, at [an] interest rate of 6.25 [percent] to an adjustable rate mortgage with a large pre-payment penalty."

Thereafter, Polander represented the Worthingtons in four real property transactions. In our record, the real estate transactions are referred to by their respective street addresses: (1) the "Camomile" agreement was executed on January 2, 2006; (2) the "Laurel Lane" agreement was executed on January 4, 2006; and (3) the "Mambrino" agreement, and (4) the "Drover" agreement, which were both executed on January 8, 2006. As will be explained in more detail below, each of these transactions proved to be poor investments, resulting in great financial losses for the Worthingtons.

## A. The Arbitration Award

The case was sent to binding arbitration pursuant to the parties' agreement. The arbitration award, prepared by retired Judge Tully H. Seymour, provided the following recitation of the facts, which we incorporate into our opinion as follows: The arbitration award recounted the Worthingtons were interested in investing in real estate and they met Polander, a licensed real estate sales agent. Polander was employed by Income Realty, owned by Van Wilson. Polander's supervisor was Gallego. Polander acted as the Worthingtons' agent in the following five real estate transactions.

---

[2] Other named defendants were Polander's employer, Peter Gallego, a real estate broker, and Gallego's company, Income Realty and Investments (Income Realty). In addition, the Worthingtons also sued Fresh Start Foundation, a charitable foundation controlled by Polander.

### i. *The Mambrino Transaction*

The arbitrator described the facts of this transaction as follows: Wilson told the Worthingtons that James and Nina Manry were buying the property from Wilson but the Worthingtons could first buy out Wilson's interest for $4,000. Polander told the Worthingtons they would make a lot of money on this transaction and that "he had screened the Manrys regarding their finances and determined they were o.k." Polander also represented the Manrys "had money and good jobs."

The arbitration award noted, "Polander testified that he met the Worthingtons through . . . Wilson at Wilson's home. Polander . . . told the Worthingtons that he and Wilson had made money investing in real estate. There was a discussion about the Mambrino property and the fact that Wilson had a contract to purchase the property. It was decided to change the contract so that the Worthingtons were substituted in as the buyers with a price increase from $630,000 to $670,000. Wilson had the Manrys as tenants and potential buyers. They were not able to purchase the property because of poor credit. Polander said that he never saw any credit report for the Manrys. Guy Worthington stated that Polander had told him that he received a letter from the Manrys describing their finances and that they were going to receive $60,000 from the sale of a coffee business. Polander did not make any investigation of the Manrys' finances. He took their word that they had the ability to pay the monthly payments. Polander testified that he left it up to the Worthingtons to check out the credit of the Manrys. Polander acted as the Worthingtons' agent in negotiating the lease and lease option with the Manrys. The Manrys made only partial payments of the rent. The Worthingtons had to evict them."

### ii. *The Drover Transaction*

The arbitrator described the facts of this transaction as follows: Polander showed this property to Ron Hewitt, but when he learned Hewitt would not qualify to buy the property due to bad credit, Polander (acting as a dual agent) introduced Hewitt to the Worthingtons "as a potential optionee on a shared appreciation agreement. Polander told the Worthingtons that Hewitt would make a $35,000 down payment. Polander did not check Hewitt's credit nor did he verify his employment. He told the Worthingtons that Hewitt made a lot of money in the boat repair business."

The Worthingtons presented evidence that "Polander represented that he had made a thorough background check of Hewitt and that Hewitt made a lot of money from working on boats. Hewitt gave [the Worthingtons] a check for $11,000. Polander told Guy Worthington to give Hewitt the keys. He did and

Hewitt moved in. The $11,000 check bounced. Hewitt paid a total of $2,900 in rent for a period that lasted from March to October 2006 when the Worthingtons were finally able to evict him."

### iii. *The Laurel Lane Transaction*

The arbitrator described the facts of this transaction as follows: "The Worthingtons purchased this property from Carl Held for $5,000 and began assuming the monthly mortgage payments of $3,138. As part of this transaction, Polander had the Worthingtons execute a promissory note in the principal amount of $48,000 payable to [the] Fresh Start Foundation . . . . Polander explained the note by saying that if the Worthingtons were not able to obtain financing, Polander would make up the difference. The Worthingtons subsequently lost the property through foreclosure." The Worthingtons also alleged Polander misrepresented his ability to secure a tenant to occupy the property.

### iv. *The Camomile Transaction*

The arbitrator described the facts of this transaction as follows: "Polander represented the Worthingtons who were the buyers, and the seller Carl Held in the sale transaction. The terms of the sale called for the Worthingtons to pay $20,000 to Held and assume the mortgages which were represented by Polander to total $540,000. The purchase price shown on the contract was $560,000. In reality, Held's mortgages totaled approximately $458,000. This resulted in an undisclosed equity of approximately $102,000 in the property. Polander delivered the $20,000 cashier's check to Held and then had him sign over the property to the Fresh Start Foundation which Polander controlled. Both Held and the Worthingtons testified they believed that the transaction was between them. They said they did not realize that title was going to the Fresh Start Foundation."

Polander asserted he disclosed the Fresh Start Foundation's involvement to both Held and the Worthingtons and they should have realized what was happening from the paperwork. The arbitrator stated, "Polander's explanation for this bizarre transaction was that he set it up that way so that he could get a commission since he did not have a listing from Held. Polander admitted he did not disclose the profit that he was going to make on the transaction."

The Worthingtons made mortgage payments on the Camomile property for nine months. Polander refused to convey title to them. The Worthingtons filed suit against Polander and his wife, as the record owners. In response, Polander's attorney, Scott Sayre, sent the Worthingtons a letter stating Polander had secured a buyer for the property. He proposed the following

settlement of the lawsuit: Polander would split the net profits from the sale (totaling $59,000) if the Worthingtons would release the lis pendens. In addition, the selling costs would include payment of a 3 percent commission to Polander. The Worthingtons accepted the proposed settlement and released the lis pendens. After the property was sold, the Worthingtons learned Sayre's attorney fees and the repayment of an undisclosed third deed of trust ($24,000) recorded against the property reduced the net profits to $7,000.

### v. *The Marsh Court Transaction*

This final transaction mentioned in the arbitrator's award is not at issue on appeal, but we nevertheless include it because it is evidence of one more failed transaction between these parties. Polander represented to the Worthingtons this property would be a good investment. The Worthingtons lost their $1,000 deposit in escrow because the "transaction was not completed."

### vi. *The Arbitrator's Analysis*

In the final section of the arbitration award, the arbitrator offered a two-page analysis that we will recite almost in its entirety because it should be considered in context of the whole analysis. The arbitrator concluded: "The evidence in this case shows that Polander committed serious and deliberate violations of his fiduciary duties owed to the Worthingtons as their real estate agent. It is clear that the Worthingtons relied on Polander's representations that they would make money through the shared equity investment scheme that he proposed. They trusted his advice as an experienced real estate professional and they believed that he would guide them in finding properties that had good potential appreciation and that he would help them find tenant/optionees that would be financially reliable. The statutory and case law establish that a real estate agent has a fiduciary duty to disclose all material facts to his principal and to act with the utmost good faith in his dealings with the principal."

The arbitrator concluded, "Polander breached this duty by representing that the tenants he procured in the Mambrino, Drover Court, and Camomile properties were good risks and were financially capable of making the lease option/rental payments. Although Polander told the Worthingtons that the optionees had bad credit, he represented that they had good jobs, good cash flow, and could make the payments. Polander did not make any investigation to confirm what the tenants represented about their finances. He did not make any credit checks which would have revealed bankruptcies, evictions, judgments and other relevant information. He did not confirm their employment or their incomes. A credit check of Hewitt would have revealed his bankruptcy and 29 judgments against him. This was not just one instance; there

were a series of financially impaired tenants. The Worthingtons relied on Polander's assurances that the tenants were capable of making the payments. The Worthingtons had a right to rely upon the statements and recommendations made to them, and had no duty to make an independent investigation."

After this overview of the basis for the judgment, the arbitrator touched on each of the transactions as follows: "The Camomile transaction involved outright fraud and underhanded conduct on the part of Polander. His representations to Held and the Worthingtons about the value of the property were serious breaches of his duty to make full disclosures. In buying the property in the name of [the Fresh Start Foundation] . . . [Polander] concealed the fact that he was buying the property for himself. His explanation that the sale documents disclosed the fact that [the Fresh Start Foundation] was buying the property is accurate as far as it goes, but it does not square with the representations that he made to both Held and the Worthingtons that the Worthingtons were the buyers. Furthermore, a real estate agent is required to make an express disclosure and to obtain the client's consent. It is common knowledge that people sign legally binding documents without reading the details, particularly when a professional whom they trust tells them the nature and effect of the documents. The Worthingtons and . . . Held relied on what Polander told them and they did not pay attention to what they were signing. The Worthingtons were unsophisticated people who were taken for a ride by an unscrupulous, dishonest agent intent on earning commissions. The Worthingtons trusted Polander implicitly. Unfortunately for them, he abused their trust and they lost their life savings."

In the final part of the arbitrator's analysis, the arbitrator specifically discussed the Laurel Lane transaction, stating the Worthingtons entered into that transaction based on Polander's representation "they would have to buy Laurel Lane in order to buy Camomile. Polander represented that he would find a tenant or a buyer for the Laurel Lane property. He failed to perform and as a result [the] Worthingtons were unable to continue making the payments on the property. It was lost in foreclosure."

The arbitrator also addressed arguments raised by defense counsel in closing argument. He rejected the claim Polander failed to make any specific representations regarding the Manrys. He also was not persuaded by Polander's argument the representation Hewitt had been " 'fully screened' " was ambiguous. The arbitrator concluded under the circumstances it was plainly a representation Polander had "investigated Hewitt's finances and found them adequate." In addition, the arbitrator rejected Polander's defense he was shielded from personal liability because he was working for a corporation. The arbitrator explained the real estate license is held by an individual, not the corporation, and the licensee is accountable for his misconduct.

The arbitrator concluded Gallego was vicariously liable for Polander's torts. The arbitrator ordered damages as follows: (1) $30,308.74 for the Mambrino transaction (mortgage payments, association dues, property taxes, and special assessments); (2) $52,272.29 for the Drover transaction (mortgage payments, association dues, property taxes, escrow deposit, and closing costs); (3) $32,865.15 for the Camomile transaction (mortgage payments and association dues); (4) $17,864.77 for the Laurel Lane transaction (mortgage payments and association dues); (5) $25,000 purchase money for the Laurel Lane and Camomile transactions; and (6) $59,188 lost profit on the Camomile transaction. The amount of these damages totaled $217,499 and was awarded against Polander, Income Realty, and Gallego jointly and severally. In addition, the arbitrator awarded $35,000 exemplary damages against Polander and Income Realty based on the fraudulent misrepresentation of the Camomile property. The arbitrator awarded $37,000 for attorney fees against Polander and Income Realty.[3] The court entered a final judgment in May 2008.

## B. *Application to the Department of Real Estate*

When the Worthingtons were unable to collect from Polander and the other defendants, they filed an application with the Recovery Account for payment of the unsatisfied judgment. The Commissioner issued a written opinion, concluding the Worthingtons could recover on the Camomile transaction but not the other transactions.

In the opinion, the Commissioner essentially recounted many of the same factual findings delineated in the arbitrator's award (which we need not repeat). However, a few new facts came to light in the Commissioner's opinion.

With respect to the Camomile transaction, the Commissioner determined the Worthingtons paid $20,000 and assumed Held's monthly mortgage payment and homeowners association dues. Polander made a commission of $5,000. Polander never conveyed the property to the Worthingtons, and he kept the proceeds of the subsequent sale.

The Commissioner stated Polander told the Worthingtons they were required to purchase the Laurel Lane property (also owned by Held) to complete the Camomile property transaction. Not wanting to lose the Camomile deal, the Worthingtons paid Held $5,000 and started assuming his monthly mortgage and association dues. Polander never disclosed to the

---

[3] The award was rendered on March 4, 2008, but later supplemented to add the Fresh Start Foundation as an additional party responsible to pay the award. The supplemental award added the Fresh Start Foundation as a joint obligor to the $217,499 actual damages and $37,000 attorney fees, and solely liable for an additional $25,000 in punitive damages.

Worthingtons that they were assuming a mortgage with an adjustable interest rate. After the purchase, Held's mortgage payments adjusted, and the Worthingtons could no longer make the payments.

With respect to the Mambrino transaction, the Commissioner concluded the Worthingtons made a downpayment of $7,050 and began making monthly mortgage and homeowners association dues payments. Before the purchase, Polander represented the property was a good deal and he would negotiate an " 'equity share' agreement" with James Manry. Polander also represented he had reviewed James Manry's credit report and determined he made enough money to pay the monthly mortgage payments. In reality, Polander had not made any investigation into the Manrys' finances. After evicting the Manrys, the Worthingtons lost the Mambrino property through foreclosure.

The Commissioner noted the arbitration award included findings of fact and conclusions of law. The Commissioner noted the arbitrator determined Polander defrauded the Worthingtons in the Camomile property transaction and awarded them actual damages as well as $35,000 exemplary damages. The Commissioner determined the award reflected the legal conclusion Polander breached his fiduciary duty with respect to the Laurel Lane, Drover, and Mambrino property transactions. As to these transactions, the Worthingtons were awarded actual damages and attorney fees.

The Commissioner determined that because the Worthingtons had a final judgment based on fraud as to the Camomile property transaction, and had satisfied all the other requirements of section 10471, they should collect $50,000 from the Recovery Account. The Commissioner concluded the Worthingtons would not receive money for the other transactions because the judgment award indicated those transactions arose from Polander's breach of his fiduciary duty. Section 10471, subdivision (a), requires a judgment based upon the real estate agent's "fraud, misrepresentation, or deceit, made with intent to defraud, or conversion of trust funds."

The Commissioner noted this result was consistent with the allegations pled in the complaint. The fraud cause of action only made reference to the Camomile property. The breach of fiduciary duty claim made reference to the Laurel Lane, Drover, and Mambrino transactions.

## C.  Proceedings in the Trial Court

The Worthingtons filed an "Application for Order Directing Payment out of [the] Recovery Account" for the Laurel Lane, Drover, and Mambrino transactions. On April 29, 2011, after taking the briefing and argument under submission, the court issued the following minute order: "The California

Department of Real Estate has a Recovery Account out of which unsatisfied judgments against a licensed real estate broker based on his fraud may be paid to the judgment creditor upon a specified application procedure. . . . [¶] On March 9, 2010, the . . . Commissioner made the decision to pay [the Worthingtons] $50,000 from the Recovery Account. The remainder of the claim was denied on the basis that [section 10471, subdivision (a)] requires that the judgment be based on the [real estate agent's] fraud, misrepresentation, or deceit, made with intent to defraud, or conversion of trust funds to support payment from the Recovery Account. . . . [¶] On July 27, 2010, [the Worthingtons] filed an [a]pplication . . . seeking recovery on the other three transactions. . . . [¶] The parties stipulated to a trial on the briefs . . . and the [c]ourt took the matter under submission . . . . The issue presented by this trial on stipulated facts is whether [the Worthingtons] are entitled to recover in connection with the other three transactions."

The trial court concluded its standard of review was de novo, stating, " 'The claimant shall be entitled to a de novo review of the merits of the application as contained in the administrative record.' [(§ 10472.1, subd. (b).)]" Applying this standard of review, the trial court concluded, "The purpose of the Recovery Fund is to satisfy certain types of judgments against licensed real estate brokers and agents as defined in the Real Estate Recovery Program when the aggrieved parties would otherwise go unpaid. . . . There is no case directly on point, and whether a judgment on a cause of action for breach of fiduciary duty that is based on fraud by the realtor falls within the coverage of the statute is not a clear-cut issue. [¶] Courts have said that '[the Act] is to be given a liberal construction to promote its purpose and protect persons within its purview. As such, it has been held that relief will be granted under section 10471 unless to do so is clearly forbidden by statute. [Section 10471] will be construed when its meaning is doubtful so as to suppress the mischief at which it is directed, to advance or extend the remedy provided, and to bring within the scope of the law every case which comes clearly within its spirit and policy.' [Citation.] [¶] This expansive view is tempered by the 1987 amendments which were made to address claims that were brought by claimants who used judicial procedures designed solely to assure access to the Recovery Act. (See *Yergan v. Department of Real Estate* (2000) 77 Cal.App.4th 959, 966 [92 Cal.Rptr.2d 189]). The applicant has the burden of proving that the cause of action against the licensee was for fraud. (§ 10471.)"

The court cited section 10471 in its entirety and recited well-established case authority on the general rules for statutory construction. The court then examined *Doyle v. Department of Real Estate* (1994) 30 Cal.App.4th 893 [36 Cal.Rptr.2d 193] (*Doyle*). The trial court found this case to be particularly instructive, stating it involved "a real estate broker who settled a fraud and deceit action against him arising out of a real estate transaction, and a

stipulated judgment was filed. After the judgment creditors were unable to collect on the judgment, they applied for payment from the Recovery Account. The trial court and the appellate court rejected the broker's arguments that the judgment was not based on fraud. Although the stipulated judgment itself did not reveal its basis, the [C]ommissioner properly considered that the only cause of action alleged in the complaint was for fraud and deceit, and also properly considered the facts set forth in the application to the Department of Real Estate. The appellate court stated, 'It has been consistently held that section 10471 is a remedial statute intended to protect the public from loss resulting from unsatisfied damage awards against licensed real estate personnel resulting from their misrepresentation and breach of fiduciary duty.' (*Id.* at p. 896, italics and citations omitted; superseded on other grounds by the 1987 [a]mendments as noted in *Davis v. Harris* (1998) 61 Cal.App.4th 507, 510 [71 Cal.Rptr.2d 591].) Admittedly this is *dicta*, because the case involved a claim for fraud, but it does provide some support for [the Worthingtons'] position."

In addition, the trial court explained the Department's reliance on *Yergan v. Department of Real Estate, supra,* 77 Cal.App.4th at page 966 (*Yergan*) was misplaced because the case was distinguishable: "In *Yergan*, the parties entered a settlement agreement alleging causes of action for negligence and breach of [fiduciary] duty. (*Id.* at p. 963.) . . . [J]udgment was entered pursuant to a stipulation in a settlement agreement; when the judgment was not satisfied, the [p]laintiffs sought recovery from the Recovery Program. The [c]ourt concluded that neither negligence nor breach of duty under the judgment entered on the settlement agreement provided a basis for payment from the Recovery Account. [¶] 'The settlement agreement provided that the agreement was a compromise of disputed claims and that payment could not be construed as an admission of liability of the parties to the agreement. . . . Moreover, the settlement agreement explicitly states that it is a resolution only of claims based on breach of duty and professional negligence.' (*Id.* at p. 965.)"

Applying the above authority, the trial court concluded, "Here, in contrast, while breach of fiduciary duty was the claim asserted and ruled on with respect to the three transactions at issue, considering the determinations made by the [a]rbitrator, it is evident that actual fraud was encompassed within the [a]rbitration [a]ward and the [j]udgment entered thereon. A cause of action for breach of fiduciary duty can be based on fraud. (See *Salahutdin v. Valley of California* (1994) 24 Cal.App.4th 555, 563 [29 Cal.Rptr.2d 463] and *Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 415 [98 Cal.Rptr.2d 176].)"

The trial court reasoned, "The elements of fraud are (a) misrepresentation, (b) [d]efendant's knowledge of the statement's falsity, (c) intent to defraud,

(d) justifiable reliance and (e) resulting damage. [Citation.] The findings in the [a]rbitration [a]ward show that each of the elements of fraud had been established with respect to the Mambrino and Drover properties. The [a]rbitrator's [a]ward established that his imposition of liability for breach of fiduciary duty for the Mambrino property was based on . . . Polander's misrepresentations as to the suitability of the tenants. [Citation.] The [a]rbitrator's [a]ward with respect to the Drover transaction demonstrates that it was based on Polander's false representations concerning Hewitt's suitability as a potential optionee on a shared appreciation agreement. [Citation.] . . . Polander made statements that he had conducted credit checks when he had not done so. These were misrepresentations. . . . Polander made the statements with intent to induce [the Worthingtons] to rely on the statements. [The Worthingtons] justifiably relied on them and entered each of the real estate transactions, which caused them damage. The award went on to state that Polander's actions concerning the Camomile property constituted 'outright fraud and underhanded conduct by the Defendants.' 'The Worthingtons were unsophisticated people who were taken for a ride by an unscrupulous, dishonest agent intent on earning commissions.' [Citation.]"

The trial court further explained, "With respect to [the] Mambrino and Drover transactions, there was a breach of fiduciary duty by [Polander] resulting from fraudulent misrepresentations. With respect to the Mambrino property (which involved representations concerning the Manrys), and the Drover property (which involved Hewitt), the findings show that the breach of fiduciary duty was based on fraud by Polander. However, for the reasons discussed below, the findings concerning the Laurel property do not show that the judgment was based on fraud."

It the minute order, the trial court included large portions of the arbitration award verbatim, supporting its conclusion the award was based on a finding of fraud and fraudulent misrepresentations with respect to the Camomile, Mambrino, and Drover transactions. It explained the award did not show the Laurel Lane transaction was based on fraud and therefore denied the Worthingtons' application on that issue.

The trial court awarded judgment in favor of the Worthingtons, holding they were "entitled to the following sums from the Recovery Account Unit of the Department of Real Estate arising from the fraud perpetrated on them by . . . Polander: [¶] [(1)] Mambrino $30,308.74 + 7 [percent] interest from May 1, 2006 through date of judgment, but in no event no more than

$50,000; [¶] [(2)] Drover $50,000 (no interest payable); [¶] [(3)] Camomile $50,000 (no interest payable). [¶] The application is denied with respect to the Laurel property."[4]

II

A. *Standard of Review*

The parties suggest we should apply a de novo standard of review. We disagree. As a general rule, "When a trial court has used the independent-judgment standard in an administrative mandamus proceeding, the province of the appellate court is analogous to that in an ordinary civil appeal; that is, only errors of law are subject to its cognizance. The appellate court gives the superior court's judgment the same effect as if a trial had been held in that court and reviews the court's decision to determine whether it is supported by substantial evidence. It is the trial court's findings, and not those of the administrative agency, that will be reviewed on appeal, unless the trial court failed to make adequate findings. [¶] The appellate court will examine the whole record, including the administrative record, to determine whether substantial evidence supports the trial court's decision, and will resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court. In applying this substantial evidence test, the power of the appellate court begins and ends with a determination of whether there is any substantial evidence, contradicted or uncontradicted, to support the trial court's findings. The appellate court's task is not to decide whether different findings would have been more reasonable, and the appellate court will not disturb the trial court's implicit factual findings if those findings are supported by substantial evidence. These rules of appellate review apply even where the evidence in the administrative record is undisputed, if that evidence is subject to conflicting inferences with respect to the crucial issue; in such a case, if the inferences drawn by the trial court are supported by substantial evidence, they are binding on the reviewing court." (2A Cal.Jur.3d (2012) Administrative Law, § 752, pp. 225–227, fns. omitted.)

"The appellate court will reverse the judgment of the superior court only if it is based on an erroneous conclusion of law. When the facts do not conflict and the issues involve proper application of a statute or administrative regulation, a reviewing court is not bound by the trial court's determination. Thus, the trial court's factual determinations are conclusive on appeal if they are supported by substantial evidence." (2A Cal.Jur.3d, *supra*, Administrative Law, § 752, p. 227, fns. omitted.)

---

[4] The court determined the Worthingtons were entitled to interest only on the award for the Mambrino transaction because, unlike the other transactions, the unpaid damages had not yet reached the statutory maximum of $50,000.

■ We conclude this same rule applies to the multiple layers of review concerning applications to collect from the Recovery Account. The statutory scheme regarding the Recovery Account specifically states the trial court independently reviews the evidence without being bound by the findings made by the Commissioner. (§ 10472.1, subd. (b) ["The claimant shall be entitled to a de novo review of the merits of the application as contained in the administrative record."].) Therefore, we are presented in this appeal with the sole question of whether there is any substantial evidence contradicted or uncontradicted which will support the trial court's findings. (See *Yergan, supra*, 77 Cal.App.4th at p. 970 [appellate court reviewing Recovery Account ruling held, "The decisions of the trial court and the Department are fully support by the record, and we affirm them."]; *Booth v. Robinson* (1983) 147 Cal.App.3d 371, 377–378 [195 Cal.Rptr. 130] (*Booth*) [appellate court reviews if substantial evidence will support the conclusion reached by the trial court in Recovery Account case].)

B. *Section 10471, Subdivision (a)*

In relevant part, section 10471, subdivision (a), states: "When an aggrieved person obtains (1) a final judgment in a court of competent jurisdiction . . . or (2) an arbitration award that includes findings of fact and conclusions of law . . . and where the arbitration award has been confirmed and reduced to judgment . . . against a defendant based upon the defendant's fraud, misrepresentation, or deceit, made with intent to defraud, or conversion of trust funds, arising directly out of any transaction in which the defendant, while licensed under this part, performed acts for which a real estate license was required, the aggrieved person may, upon the judgment becoming final, file an application with the Department . . . for payment from the . . . Recovery Account . . . of the amount unpaid on the judgment . . . ."[5]

■ Section 10471 is a "remedial statute intended to protect the public from loss resulting from unsatisfied damage awards against licensed real estate personnel . . . ." (*Doyle, supra*, 30 Cal.App.4th at p. 896.) "Remedial statutes are to be construed to promote their purposes and protect persons within their purview. Relief will be granted unless clearly forbidden by statute. [Citation.] The statute will be construed when its meaning is doubtful so as to suppress the mischief at which it is directed, to advance or extend the remedy provided, and to bring within the scope of the law every case which comes clearly within its spirit and policy. [Citation.]" (*Booth, supra*, 147 Cal.App.3d at p. 378.)

---

[5] The legislative scheme is also punitive. If the Commissioner pays from the Recovery Account any amount towards satisfaction of a judgment against a licensee, that agent's license is automatically suspended and will not be reinstated until he or she has repaid in full the amount paid from the Recovery Account. (§ 10475.)

"This expansive view is tempered by the remarks of the Legislature which, in 1987, made the following findings and declarations: '(b) The economic vitality of the Real Estate Recovery Program must be protected in order for the program to continue to perform valuable consumer protection functions. [¶] (c) An independent study completed for the Department . . . has determined that, based upon anticipated future program revenues and claims, the Real Estate Recovery Program is now insolvent. [¶] (d) In recent years the Real Estate Recovery Program has been subject to claims which have exceeded the intended purpose of the program, in certain cases brought by claimants who have employed judicial procedures designed solely to assure access to the Recovery Account. [¶] (e) Legislative action is necessary to provide sufficient funding for the Real Estate Recovery Program so that future claims within the intended scope of the program and diligently pursued by aggrieved parties may be paid in a prompt and timely fashion.' (Stats. 1987, ch. 535, § 1, pp. 1830–1831.)" (*Yergan, supra*, 77 Cal.App.4th at p. 966.)

With respect to the issue with the program being subject to "claims which have exceeded the intended purpose," the Legislature was referring to two cases (*Andrepont v. Meeker* (1984) 158 Cal.App.3d 878, 884–886 [204 Cal.Rptr. 887]; *Lorenz v. Sauer* (9th Cir. 1987) 807 F.2d 1509, 1512) in which courts permitted recovery from the Recovery Account based on negligent misrepresentation. The Legislature reversed the effect of these decisions by amending the statute to provide the Recovery Account specifically covered only claims in which there was an "intent to defraud." In short, the Legislature narrowed the available remedy to victims of deliberate fraud, which would necessarily include intentional but not negligent misrepresentations.

### C. *The Transactions*

With the legislative history in mind, we now proceed with our review of the trial court's ruling. Neither party challenges the trial court's and Commissioner's conclusion the arbitrator's award concerning the Camomile transaction established the Worthingtons proved the judgment against Polander encompassed actual fraud and clearly came within the spirit and policy of the remedial statute. The record amply supports the trial court's ruling. We affirm this portion of judgment.

The Department disagrees with the trial court's conclusion the arbitration award concerning the Mambrino and Drover transactions was also based on Polander's "fraud, misrepresentation, or deceit, made with the intent to defraud." (§ 10471.) The Department focuses on the arbitrator's legal conclusion Polander breached his fiduciary duty with respect to these transactions. It asserts the judgment specifically mentioned a fraudulent intent with respect to

the Camomile action but not with respect to the others. It concludes that a breach of fiduciary duty judgment is not covered by the Recovery Account.

The Worthingtons contend the trial court correctly looked behind the arbitration award's legal terminology and properly relied on the clear factual findings that Polander deliberately devised a fraudulent "shared equity investment scheme" involving several properties. They assert there was ample evidence of Polander's intent to defraud in all of the transactions, including the Laurel Lane transaction. For this reason, the Worthingtons assert the trial court should have ruled all the transactions were part and parcel of Polander's overall deliberate ploy to take the unsophisticated Worthingtons "for a ride" and deplete their life savings.

■ As we will explain, the trial court was right to look behind the legal terminology in the arbitration award and consider the arbitrator's factual findings. The trial court correctly recognized that in this case Polander's breach of his fiduciary duty involved more than just negligent conduct (i.e., constructive fraud), and there were factual findings evidencing a clear intent to defraud the Worthingtons in the Mambrino and Drover transactions. We conclude the trial court's decisions regarding the Mambrino, Drover and Laurel Lane transactions are fully supported by the record.

We find the Department's argument is premised on its misreading of the *Yergan* case. It argues *Yergan* holds a trial court may not look beneath the clear legal findings contained in the judgment, and because the arbitration award in this case plainly stated Polander breached his fiduciary duty, the judgment does not satisfy the requirements for the Recovery Account. It argues, "it is immaterial for Recovery Account payment purposes whether the *facts* of an underlying case may or may not demonstrate fraudulent intent . . . what is pertinent is the *basis for the underlying judgment*." It also cites to authority holding a breach of a real estate agent's fiduciary duty can amount to constructive fraud, but this unique species of fraud does not include a fraudulent intent and therefore does not qualify for the Recovery Account. (Civ. Code, § 1573, subd. (1); *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 562 [29 Cal.Rptr.2d 463].)

As we will explain, the holding of the *Yergan* case does not apply when the applicant's judgment was a result of the issues being fully adjudicated and resolved on the merits. The *Yergan* case discussed whether a *settlement agreement (and the resulting stipulated judgment)* demonstrated a valid judgment for fraud. The *Yergan* court began the opinion with a discussion of why it believed the Recovery Account would apply to a stipulated judgment. It noted section 10471 "speaks in terms of the aggrieved party obtaining a 'final judgment' and does not specifically discuss settlements, stipulated

judgments, or consent judgments." (*Yergan, supra*, 77 Cal.App.4th at p. 967.) It relied on other case authority to conclude an applicant could collect from the Recovery Account based on a stipulated judgment as long as it demonstrated the real estate agent was guilty of actual fraud. (*Ibid.*) The *Yergan* court stated the issue presented on appeal was whether the Commissioner in that case could look beyond the language of the settlement agreement in determining the basis for the award. (*Ibid.*)

The court in *Yergan* determined that because the stipulation for judgment and the judgment entered in the case did not state the basis for the recovery awarded, the Commissioner properly "looked behind these documents, but only as far as the parties' settlement agreement." (*Yergan, supra*, 77 Cal.App.4th at p. 968.) In the *Yergan* case, the complaint alleged many claims including, breach of fiduciary duty, fraud and deceit, negligent misrepresentation, and fraudulent conveyance. The settlement agreement noted there were various claims but specified the agreement covered all claims for " 'professional negligence and breach of duty.' " (*Yergan, supra*, 77 Cal.App.4th at p. 968.) The court determined because of the unambiguous language of the settlement agreement, the Commissioner and trial court determined it was unnecessary to look behind the judgment at the stipulation or other agreement that led to the judgment. The trial court also correctly realized it would be inappropriate to look at the underlying facts that could establish an action for fraud if the case had to be tried. (*Ibid.*) "The statute does not ask for proof that the applicant had valid *claims* for fraud; the applicant must demonstrate that it has a valid *judgment* for fraud." (*Ibid.*) However, the court recognized that if the wording of the judgment or settlement was ambiguous, "the Department (and the court in reviewing the Department's action) might need to look further—as it did in *Doyle*." (*Ibid.*)

The *Doyle* case also involved a settlement agreement that resulted in a stipulated judgment. (*Doyle, supra*, 30 Cal.App.4th at pp. 898–899.) The difference between *Doyle* and *Yergan* is the settlement agreement in *Doyle* simply stated the plaintiffs filed a complaint and sought damages caused by the real estate agent, and the judgment "entered pursuant to the settlement agreement and stipulation was for $15,000, the full amount sought . . . in their complaint." (*Doyle, supra*, 30 Cal.App.4th at p. 899.) The appellate court concluded that because the basis for the judgment was unclear, the Commissioner in making his decision properly looked behind the language of the settlement and "relied on the fact that the only cause of action alleged in the complaint was for 'fraud and deceit.' Moreover, in their section 10471 application, the [plaintiffs] set forth the facts underlying their cause of action for fraud. Consequently, it is apparent that the Commissioner properly determined that the judgment in this case, though a result of a settlement agreement and stipulation for entry of judgment, is 'based on fraud' as required by section 10471." (*Doyle, supra*, 30 Cal.App.4th at p. 899.)

Thus, to briefly summarize, the holdings in *Yergan* and *Doyle* are limited to cases in which there is a stipulated judgment based on a settlement. When the terms of the settlement "expressly preclude the possibility that the judgment was based on fraud, the Department is entitled to conclude that the resolution of the underlying claims occurred as set forth in the agreement entered into by the parties." (*Yergan, supra,* 77 Cal.App.4th at p. 969.) In such cases, it would be improper to go beyond what the parties expressly agreed to settle and argue there could have been a judgment based on fraudulent actions *if the case had gone to trial.*

■ Case authority involving stipulated judgments are inapt to the issue presented in this appeal. The Worthingtons' judgment was not based on partial settlement of their claims, but rather based on a judgment resolving their entire dispute. The Department cites to no authority and we found none, holding an arbitration award is akin to a settlement agreement. To the contrary, arbitration is defined as: " 'A process of dispute resolution in which a neutral third party (arbitrator) renders a decision after a hearing at which both parties have an opportunity to be heard. Where arbitration is voluntary, the disputing parties select the arbitrator who has the power to render a binding decision.' (Black's Law Dictionary (6th ed. 1990) p. 105, col. 1.)" (*Cheng-Canindin v. Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676, 684 [57 Cal.Rptr.2d 867].) Stated another way, an arbitration award results when the parties voluntarily agree to have their dispute finally resolved by a procedure other than a court action. (*Ibid.*) The legislative scheme regarding the Recovery Account recognizes the similarities between court judgments and arbitration awards. The process applies equally to applicants who have "a final judgment in a court" and to those who have "an arbitration award that includes findings of fact and conclusions of law . . . and where the arbitration award has been confirmed and reduced to judgment . . . ." (§ 10471, subd. (a).)

■ In this case, the arbitration award included findings of fact and conclusions of law. The legislative scheme calls upon the Commissioner and the trial court to examine the adjudicated facts. Section 10471, subdivision (c)(4), "clearly contemplates that the Commissioner may consider certain underlying facts in determining if the judgment was based on fraud, by providing in part that a claimant must submit an application which includes '[a] detailed narrative statement of the facts in explanation of the allegations of the complaint upon which the underlying judgment is based.' " (*Doyle, supra,* 30 Cal.App. 4th at p. 898.)[6]

---

[6] We note, in response to the application, "The judgment debtor may defend an action against the . . . Recovery Account on his or her own behalf and shall have recourse to all appropriate means of defense and review, including examination of witnesses. All matters, including, but not limited to, the issues of fraud, misrepresentation, deceit, or conversion of

Likewise, the trial court reviews the Commissioner's ruling by setting an "evidentiary hearing." (§ 10472.1, subd. (b).) At that hearing, the claimant again has the burden of proving compliance with requirements of section 10471 and is entitled to "a de novo review of the merits of the application as contained in the administrative record." (§ 10472.1, subd. (b).) Accordingly, the trial court may also consider the same facts as the Commissioner in determining if the judgment was based on fraud.

■ We therefore reject the Department's argument the trial court could look no further than the arbitrator's legal conclusion there was a breach of fiduciary duty and not consider the arbitrator's factual findings there was an intent to defraud. We also are not persuaded by the Department's contention that breach of fiduciary duty can only be characterized as constructive fraud (which does not include fraudulent intent as an element). This simply is not true: "A misrepresentation that constitutes a breach of a fiduciary or confidential a [*sic*] relationship may, depending on whether an intent to deceive is present, constitute either actual or constructive fraud. However, the issue is usually discussed in terms of whether the misrepresentation constitutes constructive fraud, because actual fraud can exist independently of a fiduciary or confidential relationship, while the existence of such a relationship is usually crucial to a finding of constructive fraud." (34A Cal.Jur.3d (2008) Fraud and Deceit § 19, pp. 385–386, fn. omitted; see *Becker v. Schwerdtle* (1903) 141 Cal. 386 [74 P. 1029] [facts showed both actual and constructive fraud]; *Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 415 [98 Cal.Rptr.2d 176] ["Breach of a real estate agent's fiduciary duty to his or her client may constitute negligence or fraud, depending on the circumstances of the case."].)

We appreciate a real estate agent may breach his fiduciary duty by making a careless misstatement, and such constructive fraud would *not* be covered by the Recovery Account. However, in this case the trial court properly recognized the arbitration award repeatedly makes the factual finding that Polander was guilty of much more than careless or negligent remarks. For example, Polander made intentional misrepresentations to falsely induce the Worthingtons over a one-week period to enter into several significant real estate transactions that wiped out their life savings. The arbitrator concluded, "The evidence in this case shows that Polander committed serious and deliberate violations of his fiduciary duties" in using the Worthingtons to carry out his "shared equity investment scheme." Polander "abused" his clients' trust and intentionally misrepresented the financial stability of the

---

trust funds, finally adjudicated in the underlying action are conclusive as to the judgment debtor and the applicant in the proceeding against the . . . Recovery Account." (§ 10473.1.) The Commissioner therefore may examine the factual findings depending on the circumstances.

"tenants he produced in the Mambrino, Drover Court, and Camomile properties." We acknowledge the trial court pulled several other relevant factual findings from the arbitration award to support its conclusion that Polander's breach of his fiduciary duty encompassed *actual fraud*. Based on this record and the court's detailed minute order, we affirm the court's ruling as to the Mambrino and Drover transactions.

D. *The Laurel Lane Transaction*

The arbitration award stated the Worthingtons purchased the Laurel Lane property owned by Held, and they executed a promissory note payable to Fresh Start Foundation. The arbitrator noted Polander promised the Worthingtons he would help them find tenants and if they were not able to obtain financing, Polander would make up the difference. The Commissioner's award contained a few more details about the transaction, stating that the day after the Worthingtons agreed to purchase the Camomile property, Polander told them that they were required to also purchase the Laurel Lane property, also owned by Held. The Worthingtons paid Held $5,000 and assumed his monthly mortgage payments. When the monthly mortgage payments adjusted, the Worthingtons could no longer afford it. Polander apparently also neglected to mention the Worthingtons were agreeing to assume a mortgage having an adjustable rate and not a fixed rate. Thus, it appears Polander breached his fiduciary duty either by (1) not keeping his promise to help with tenants and financing; (2) misrepresenting the necessity to purchase the property; or (3) failing to disclose the adjustable rate mortgage.

Like the trial court we have examined carefully the factual findings and conclusions of the arbitrator. Although we appreciate this transaction occurred close in time to Polander's other intentionally fraudulent misrepresentations, the award simply does not indicate whether the arbitrator made any factual findings or conclusions regarding whether Polander *deliberately* made false promises or misrepresentations with respect to the Laurel Lane property.

For example, the arbitrator found Polander intentionally misrepresented the financial stability of the tenants (Hewitt and the Manrys) with respect to the Mambrino and Drover transactions; however, there is no evidence Polander misrepresented a potential tenant, or even located a tenant, for the Laurel Lane property. Similarly, there is no evidence Polander intentionally refused to help the Worthingtons obtain financing. The arbitrator noted the Worthingtons lost the property due to high payments owed on the existing adjustable rate mortgage payment. There is no evidence Polander also promised to pay any shortfall for the existing mortgage. Finally, it cannot be assumed Polander intentionally misrepresented the Laurel Lane transaction was a necessary part of the Camomile transaction. As noted in the

Commissioner's award, both properties were owned by Held, who was financially insecure and indicated he needed to get "out from under" the Camomile property. It is possible he conditioned the Camomile sale on his ability to also unload his obligation to his Laurel Lane debt.

### III

The judgment is affirmed. The Worthingtons shall recover their costs on appeal.

Bedsworth, J., and Ikola, J., concurred.