Filed 9/22/16  Rodriguez v. City of Santa Cruz CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOSAFAT RODRIGUEZ, JR., | H042280 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. CV173783) |
| v. | |
| CITY OF SANTA CRUZ et al., | |
| Defendants and Appellants. | |

When former Santa Cruz Police Officer Josafat Rodriguez, Jr., applied to the City of Santa Cruz (the City) for industrial disability retirement in 2010 alleging psychiatric disability due to posttraumatic stress disorder (PTSD), the City denied Rodriguez's application.  That denial led to a petition in the superior court for a writ of mandate to set aside the City's determination, and eventually to an appeal in this court.  In a published decision, we concluded that the superior court had applied an incorrect standard of review and remanded the matter for reconsideration of Rodriguez's petition under the proper standard.  (*Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443 (*Rodriguez*).)

On remand, the superior court found that Rodriguez was substantially incapacitated from performing the duties of a police officer due to PTSD when his employment with the City's police department ended.  The court issued a peremptory writ of mandate directing the City to set aside its prior decision and to enter a new decision granting Rodriguez disability retirement benefits.

In this appeal, the City challenges the superior court's decision as unsupported by substantial evidence due to the court's reliance on medical opinions that purportedly were based on misleading and incomplete information. We find the court's assessment of the medical opinion evidence was reasonable and its overall determination supported by substantial evidence. We will affirm the judgment.

## I. BACKGROUND[1]

### A. FACTUAL BACKGROUND

#### 1. *Rodriguez's Military Service*

Rodriguez joined the United States Marine Corps in 1989 after graduating from high school. He deployed to the Persian Gulf and served as a demolition specialist in a five-man infantry fire team during the First Gulf War. Rodriguez and his team patrolled the border between Saudi Arabia and Kuwait. A mortar attack killed three of his team members and severely injured the fourth. After the attack, Rodriguez had to collect his comrades' body parts and put them into body bags. Rodriguez was immediately assigned to another fire team. He was involved in multiple fire fights and battles and witnessed soldier and civilian deaths. Rodriguez did not receive services during or after his return from the war to help with the emotional impact of his experiences. The Marine credo was "adapt and overcome."

Rodriguez was discharged from the Marines in 1993.

#### 2. *Employment with the Santa Cruz Police Department*

Rodriguez joined the Santa Cruz Police Department in 1995 and became a member of a county-wide narcotics enforcement team in 1998. As part of that team, he was involved in more than 50 house raids reminiscent of the raids he performed during

---

[1] Much of the relevant factual and procedural background was summarized in *Rodriguez*, *supra*, 227 Cal.App.4th at pages 1445 through 1450. We revisit those facts, derived from the administrative record and hearing transcripts, providing more detail where needed in order to evaluate the City's substantial evidence claim.

the war.  He also performed dangerous undercover work.  Rodriguez received commendations and positive performance evaluations in his first few years.

On a nighttime raid in January 2000, Rodriguez fell several feet through an unfinished doorway, injuring his back and leg.  He was unable to work for approximately one year as a result of the injury.  Rodriguez returned to work in a modified position as a police station duty officer because his back injury prevented him from doing field work.  He was assigned to the investigations unit as a detective on gang and drug crimes, which involved maintaining gang intelligence files, conducting interviews, and reviewing crime scene photographs and evidence.

In November 2005, Rodriguez had back surgery and was cleared to return to the police station duty officer role in July 2006.  Rodriguez declined to return, saying he was physically unable to perform the duties of police station duty officer.  At about the same time, in August 2006, Rodriguez filed an application for industrial disability retirement on the basis of disability affecting his back, hands, and wrist (first disability retirement claim).[2]

His superiors at the police department tried to engage Rodriguez in an interactive process to learn what the City could do to accommodate him.  Rodriguez returned to work for two weeks in late March and early April 2007, after being ordered to do so or face termination.  During those two weeks, Rodriguez asked to go home repeatedly due to pain.  He stopped showing up for work and was again warned that he faced termination.  On June 7, 2007, Rodriguez resigned for "health reasons."

---

[2] The City denied the first disability retirement claim in February 2008, following a hearing before an administrative law judge (ALJ) in which the ALJ found that Rodriguez was not credible in several respects and was not substantially incapacitated from performing the duties of police station duty officer.

### 3. *Second Industrial Disability Retirement Claim for PTSD*

After his resignation from the police force in 2007, Rodriguez discovered a local Department of Veterans Affairs clinic. He met with a counselor and learned for the first time about PTSD. The counselor encouraged Rodriguez to apply for veteran's disability. Rodriguez was evaluated by a Department of Veterans Affairs psychologist twice in 2008 and by a psychiatrist in 2010. Rodriguez reapplied to the City for industrial disability retirement in June 2010, this time claiming disability caused by PTSD (second disability retirement claim).

At the October 2011 administrative hearing on that application, Rodriguez testified that he began having anxiety, difficulty sleeping, and nightmares about combat while serving on the narcotics enforcement team early in his police career. He did not tell anyone but tried to "adapt and overcome" as in the Marines. He began drinking to fall asleep. Rodriguez feared that admitting his distress would show weakness and raise doubts in the police department about his abilities and mental fitness.

The sleep disturbances improved during the year that Rodriguez was on leave for his back injury. But when he returned to work as a detective in the investigations unit, Rodriguez experienced increasing difficulty sleeping and had nightmares and flashbacks to the war. He felt "lost," struggled with his assignments, and feared he was losing his mind and could not do the job. During a gang homicide case, Rodriguez was asked to go to the autopsy of the victim and refused. During interviews that he conducted in interview rooms at the police station, he "always feared" that the person he was interviewing was a "hit person." Hearing police sirens he "would—just automatically started thinking about, you know, like sirens out in—in Kuwait," and "just hearing the radio, . . . Code 3, which means emergency response, . . . I'd start getting startled, just always looking over my shoulder and just feeling, um, this—this feeling anxious and real panicky." When alcohol did not suffice to help him sleep, he would mix it with his pain

medication. He never discussed his worsening issues with his wife, who eventually filed for divorce. His relationship with his children suffered.

Rodriguez attributed his performance and disciplinary failures in 2006 and 2007 to PTSD, though he did not know it at the time and understood only the pain of his physical conditions. Rodriguez did not speak to anyone about his symptoms even though he was in counseling. According to Rodriguez, his counselor, Dr. Malis, was not a veteran and did not have experience working with veterans. During therapy, he did not talk about the war except on one occasion when he shared a disturbing memory of a close-range shooting with an Iraqi soldier. Rodriguez never advised anybody at the police department that he could not perform his tasks except due to physical pain. He testified that he had a lot of problems remembering the period from 2001 to 2005 or 2006.

Two of Rodriguez's supervisors with the Santa Cruz Police Department testified about his performance.[3] Deputy Chief Steven Clark testified that he assigned Rodriguez to the investigations unit because he had "high expectations" based on the skills and capabilities that Rodriguez had demonstrated as a patrol, narcotics enforcement, and undercover officer. But Rodriguez was dissatisfied and "never engaged" in the same way that he had when he was working in the field. Deputy Chief Clark explained: "[Rodriguez] didn't like his assignment. It was that clear. He did not want to be working in . . . what we refer to as a light-duty position, . . . . [H]e wanted to be out there in the field working." Deputy Chief Clark also testified that Rodriguez at one point told him that "the job assignment was bullshit . . ." and went so far as to ask, " 'How much of a pain do I need to be with the city before they give me medical retirement?' " Deputy

---

[3] By stipulation of the parties at the October 2011 administrative hearing, the transcript of the deposition testimony of Deputy Chief Sapone was admitted as direct evidence.

5

Chief Clark believed that Rodriguez "knew how to work the system, and he was looking for an avenue to do that."

Retired Deputy Chief Patricia Sapone testified that after Rodriguez declined to return to the police station duty officer position in 2006, she began an interactive process to find out what the City could do for him. But Rodriguez offered nothing "to show what had changed or what was different" from his ability to perform the police station duty officer role in the preceding years. Deputy Chief Sapone recommended termination in November 2006 after Rodriguez failed to come to work. She explained: "[Rodriguez] had nothing to show that he could not show up for work and had provided nothing to the city or myself to show that he . . . had any lawful reason not to show up to work or to violate a direct order." Although the 2006 termination notice was rescinded, Rodriguez returned to work for only two weeks in 2007 after which "[h]e basically walked off the job without following any city or department procedures." Deputy Chief Sapone could not recall Rodriguez having ever disobeyed an order or having failed to perform his assigned work before that period.

Rodriguez also testified as to his activities outside of police work. He obtained his real estate license sometime around 2002. He affiliated with a broker and was a "team leader" in 2006, though he was unable to recall any details about the work. Rodriguez earned $95,000 from real estate work in 2005 and $24,000 in 2006. He testified that he had not sold any real estate since 2006. He at one point purchased between five and 10 investment properties, which he rented out and managed.[4] His superiors at the police department were aware of and allowed the real estate work as long as it did not interfere with police work.

---

[4] While admitting that five to 10 properties was a wide spread, Rodriguez could not provide more specific information other than stating that he lost the properties either during his divorce or in bankruptcy.

Rodriguez also helped found a volunteer nonprofit organization called the Central Coast Gang Investigator Association sometime before 2001. He served on the original board of directors. In February 2011, the group's Web site identified Rodriguez as a member of its advisory council, though he testified that he had not been involved with the group since 2006 or 2007.

Between 2004 and 2007, Rodriguez formed two corporations and a family trust. He testified that he had no memory of doing so. He also discovered that he had increased his life insurance during that time to umbrella policies worth millions of dollars. When asked about his lack of memory, he stated, "Bringing it all together I just think that I was—I was going insane during that time."

In 2009 or 2010, Rodriguez started his own private investigation business after passing a state license exam. He testified that he works infrequently, primarily doing court record searches and helping with bilingual interviews or Spanish translation. He only helps with civil cases and has refused offers to work on criminal matters. Rodriguez also volunteers as a mentor for at-risk youth.

### 4. *Medical Evidence Presented at the 2011 Disability Hearing*

Reports from six medical professionals were admitted at the administrative hearing.

*Marsha Malis, Ph.D.*

Marsha Malis, Ph.D., a marriage and family therapist, treated Rodriguez for an unspecified duration while he was a police officer. Dr. Malis stated in a January 2008 report that in recent therapy Rodriguez "has repeatedly mentioned his concern over his physical and psychological health" and that he "exhibits signs of anxiety, depression, fear and pain over the issues related to continued police work." Dr. Malis attributed that anxiety to Rodriguez's physical pain and his resulting inability to perform his job duties. Dr. Malis recommended that Rodriguez "be relieved of all participation with police

work" due to "his current levels of depression, anxiety, fear and pain that are a direct result of his police work . . . ." She made no mention of PTSD.

*Peter Berman*, *Ph.D.*

Peter Berman, Ph.D., of the Department of Veterans Affairs, evaluated Rodriguez for PTSD in February 2008. Dr. Berman diagnosed Rodriguez with "significant symptoms" of PTSD and secondary depression and alcohol abuse in an attempt to self-medicate for PTSD. According to the report, Rodriguez was working for an event company at the time of his interview but was struggling to keep the job. Dr. Berman opined, "It is clear that [Rodriguez] has been suffering from severe symptoms of posttraumatic stress disorder . . . ."

Dr. Berman conducted a review examination in August 2008 and concluded that Rodriguez's PTSD symptoms had worsened. According to the report, Rodriguez was fired from his event planner job and from his previous job as a police officer because of an inability to focus or follow discipline. Dr. Berman described Rodriguez as "[o]ne of the more impaired people I have seen."

*Carla Galloway*, *M.D.*

Carla Galloway, M.D., also affiliated with the Department of Veterans Affairs, conducted a PTSD review examination of Rodriguez in December 2009. Dr. Galloway determined that Rodriguez was not "capable of substantially gainful employment at the present time without further treatment." Her report documented Rodriguez's "post-military trauma history," specifically Rodriguez's recall of a gunfight when working as a police officer, having "had guns pulled on him," including once by a 12-year-old boy, and having had problems "when he smelled blood on the job." Dr. Galloway summarized Rodriguez's comments on his police employment, noting that "initially his job performance was good, until 2006 and 2007 when he was having significant problems with insomnia and intrusive thoughts of the Gulf War" and was eventually fired for not showing up and not following orders.

*James Bryant*, *Ph.D.*

James Bryant, Ph.D., a clinical psychologist, performed psychological tests on Rodriguez in August 2011 at the request of Mark A. Snyder, M.D., who was retained by the City in connection with Rodriguez's second disability retirement claim. Dr. Bryant reported that Rodriguez "responded to the test items in a consistent and reliable manner" and did not present "any symptom magnification or fabrication." His scores indicated in pertinent part "a patient who is being defensive and unwilling to acknowledge psychological distress" and whose "physical symptoms reflect not only massive overcontrol but also the shifting of attention away from anxiety-loaded topics onto somatic symptoms." Dr. Bryant diagnosed Rodriguez with PTSD and generalized anxiety disorder.

*Trent E. Cornell*, *Ph.D.*

Trent E. Cornell, Ph.D., a clinical psychologist retained by Rodriguez, diagnosed Rodriguez with PTSD in a report dated September 13, 2011. Dr. Cornell based that diagnosis on two hour-long sessions with Rodriguez in July and August 2011, a conversation with Dr. Malis, Dr. Berman's reports, Dr. Galloway's report, documents from the Santa Cruz Police Department, and the results of Dr. Bryant's psychological testing. Dr. Cornell opined that Rodriguez's PTSD was exacerbated by his police work, particularly his work in narcotics enforcement, which involved dangers and violence reminiscent of those he faced in combat.

In a second report dated October 5, 2011, Dr. Cornell opined that Rodriguez was substantially incapacitated from performing the duties of police station duty officer at the time that he resigned and that "any form of 'police work' would intensify his [PTSD] symptomatology."

*Mark A. Snyder*, *M.D.*

Mark A. Snyder, M.D., interviewed Rodriguez for two-and-a-half hours in June 2011. He also reviewed Dr. Bryant's psychological test results, records from the

9

Santa Cruz Police Department, and various medical records, including the Department of Veterans Affairs' reports. In his first report, dated September 6, 2011, Dr. Snyder diagnosed Rodriguez with PTSD. Dr. Snyder explained that he had requested psychological testing due to concerns about Rodriguez's credibility, given Rodriguez's failure to disclose his symptoms to the police department, his family, or Dr. Malis. Dr. Snyder also noted that "significantly delayed onset of . . . Post Traumatic Stress Disorder," as described by Rodriguez, is "infrequent." Nevertheless, Dr. Snyder concluded that Rodriguez's failure to report any symptoms was consistent with the psychological test results, which indicated that Rodriguez was in denial about his psychological problems, and that his difficulty organizing his thoughts and his fear that he was "going crazy" motivated him "to keep matters private."

According to Dr. Snyder, the PTSD "was a consequence of [Rodriguez's] experiences in the Police Department and his experiences in the Marine Corps," and the disorder was "awakened" from a "latent" and "repressed" state by life threatening police work. Dr. Snyder also diagnosed Rodriguez with panic disorder without agoraphobia, generalized anxiety disorder, and a personality disorder. Dr. Snyder concluded that Rodriguez "is substantially incapacitated and unable to perform . . . the duties of a Police Station Duty Officer because even such an environment provides a sufficient number of cues that provoke memories of disturbing events and stimulate [Rodriguez] to develop anxiety." Regarding possible treatment, Dr. Snyder summarized Rodriguez's preference to "handle his problems himself" and not engage in therapy or accept medication. "This tendency is part of the basis for his non disclosure of the upsetting difficulties he was experiencing while working in the police force. The patient wants to manage things himself, does not wish to discuss matters which are upsetting, and wishes to control the pace at which such matters might be discussed."

The City asked Dr. Snyder to reconsider his findings based on additional documents. The City provided Dr. Snyder with the ALJ's proposed decision denying

Rodriguez's first disability retirement claim and a printout from the Central Coast Gang Investigator Association Web site listing Rodriguez as a member of its advisory council.

In a second report, dated September 28, 2011 (second report), Dr. Snyder concluded that Rodriguez was not credible. Dr. Snyder noted that Rodriguez had not disclosed his real estate work and the substantial income it generated, the corporation he had formed (which Dr. Snyder characterized as "a second job"), or his role with the Central Coast Gang Investigator Association. Dr. Snyder repeated the ALJ's findings in connection with the first disability retirement claim that Rodriguez's testimony was not credible insofar as he claimed to not remember significant details about his real estate work and other engagements. Dr. Snyder also pointed to Rodriguez's failure to inform the police department about his psychological problems, inconsistencies between what Rodriguez told physicians and his deposition testimony,[5] and Rodriguez's uncooperative behavior toward the police department despite the department's efforts to accommodate him.

Dr. Snyder determined in his second report that "on the basis of [Rodriguez's] lack of credibility coupled with the fact that, while claiming disability, he [was] able to work as a real estate agent, start a corporation, [and] be on the board of a community organization," Rodriguez was not substantially incapacitated from a psychiatric standpoint from performing the duties of police station duty officer.

B. **PROCEDURAL BACKGROUND**

### 1. *December 13, 2011 ALJ Decision*

In a 13-page decision, the ALJ concluded that Rodriguez failed to establish that he was substantially unable to perform the duties of police station duty officer as a result of

---

[5] The subject deposition was in connection with Rodriguez's first disability retirement claim and is not included in the October 2011 administrative hearing record or the record on appeal.

11

a psychiatric condition at the time he stopped working for the City.  The ALJ did not doubt the accuracy of Rodriguez's PTSD diagnosis.  However, she concluded that despite his "harrowing" wartime experiences, Rodriguez "was able to return home, be employed successfully as a police officer for many years, obtain a real estate salesperson license, engage in the real estate business, start another business, manage properties, perform many volunteer activities, and . . . establish his own, albeit new, business as a private investigator, after taking and passing a licensure examination."  The ALJ stated that Rodriguez's "lack of memory (not shown to be a symptom of or attributable to PTSD) of his activities outside his police work and his failure to provide all the relevant facts and information to the medical professionals examining him negatively affected his credibility."

The City adopted the proposed decision of the ALJ and denied the second disability retirement claim on January 12, 2012.

### 2. *Petition for Writ of Administrative Mandate and Appeal*

Rodriguez filed a petition for writ of administrative mandate seeking to set aside the City's decision.  The superior court denied the petition on August 27, 2012, stating in a written decision that while there appeared to be "no reasonable doubt" that Rodriguez suffers from psychiatric disorders, there was "sufficient evidence" to uphold the ALJ's finding that Rodriguez lacked credibility and was not incapacitated from working as a police station duty officer.

On appeal, this court reversed and remanded the matter for the superior court to reconsider the petition under the independent judgment standard of review.  (*Rodriguez, supra*, 227 Cal.App.4th at pp. 1454-1455.)  In concluding that the trial court likely did not apply the proper standard, we noted the court had not articulated any "independent finding regarding Rodriguez's credibility, stating only that there is sufficient evidence to support *the ALJ's finding* that he lacked credibility" and in so doing "may have

12

disregarded Rodriguez's testimony based solely on the ALJ's credibility finding." (*Id*. at p. 1454.)

### 3. *Reconsideration of the Petition for Writ of Administrative Mandate*

On remand, the trial court considered the written and oral arguments of counsel, and the administrative record, including the medical opinions that were admitted at the October 2011 hearing and the transcripts of Rodriguez's testimony and that of Deputy Chief Clark and Deputy Chief Sapone.

Applying its independent judgment, the trial court determined that Rodriguez was incapacitated from performing his police officer duties due to PTSD at the time of his resignation in June 2007 and thereby was eligible for special disability retirement benefits within the meaning of the Public Employees' Retirement Law (Gov. Code, § 20000 et seq.). [6] The court specifically found that three medical reports offered substantial evidence of Rodriguez's disability based on PTSD. These were the two reports of Dr. Cornell and the first report of Dr. Snyder. The court also found that Dr. Snyder's reversal of medical opinion in his second report was not justified by the information cited and, therefore, did not constitute substantial evidence.

On April 6, 2015, the trial court granted a peremptory writ of mandate that the City set aside its prior decision and enter a new decision granting Rodriguez disability retirement benefits. The City timely appealed.

## II.     DISCUSSION

### A. STANDARD OF REVIEW

This court previously noted that Rodriguez's claim involved a " 'fundamental vested right to a disability retirement pension if he in fact was disabled.' " (*Rodriguez*,

---

[6] The City does not challenge the trial court's construal of the term "incapacitated for the performance of duty," which means " 'the *substantial* inability of the applicant to perform his usual duties.' " (*Rodriguez*, *supra*, 227 Cal.App.4th at p. 1451, quoting *Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873, 876.)

13

*supra*, 227 Cal.App.4th at p. 1452, quoting *Quintana v. Board of Administration* (1976) 54 Cal.App.3d 1018, 1023.)  This required the trial court to exercise its independent judgment in reviewing the administrative agency decision, essentially making "its own findings after first giving due respect to the agency's findings." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 818 (*Fukuda*); *Rodriguez*, *supra*, at p. 1451.)[7]

When the trial court has exercised its independent judgment in examining an administrative decision involving a fundamental right, the standard of review on appeal is the substantial evidence test.  (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 851; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10; see also *Fukuda*, *supra*, 20 Cal.4th at p. 824.)  The City does not contend that the trial court on remand failed to adhere to the independent judgment standard.  Accordingly, our review of the trial court's findings is limited to a determination "whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support" the trial court's findings. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, italics omitted (*Bowers*).) Under the substantial evidence test, we " ' "resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court." ' " (*Rodriguez*, *supra*, 227 Cal.App.4th at p. 1452; *Worthington v. Davi* (2012) 208 Cal.App.4th 263, 277.)  Substantial evidence is " 'evidence that a rational trier of fact could find to be reasonable, credible, and of solid value.' " (*Seibert v. City of San Jose*

---

[7] We explained the trial court's task in this regard in *Rodriguez*, *supra*, 227 Cal.App.4th at page 1451:  " 'In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' ([*Fukuda*, *supra*, 20 Cal.4th at p. 817].)  However, the court also has the 'responsibility to weigh the evidence at the administrative hearing and to make its own determination of the credibility of witnesses.' (*Guymon v. Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1016.)"

14

(2016) 247 Cal.App.4th 1027, 1064, quoting *Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 99.)

## B. ANALYSIS

The City challenges the foundation for Dr. Cornell's conclusions and Dr. Snyder's first-report conclusions as inadequate due to their basis in a misleading and incomplete patient history provided by Rodriguez. The City argues that because these reports were not based on a *complete* record, they "cannot rise to the dignity of substantial evidence." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 (*Zuckerman*).) The City argues that Dr. Snyder's second report, in contrast, is the only medical opinion based on complete and accurate evidence, including the administrative record from the first disability retirement claim, which revealed Rodriguez's endeavors outside of police work while he was claiming disability on the basis of his physical problems.

Rodriguez responds that on appeal from the trial court's exercise of independent judgment, it is not enough that Dr. Snyder's second report is favorable to the City's position, so long as substantial evidence, disputed or not, exists in the record to support the trial court's ruling.[8] (See *Bowers*, *supra*, 150 Cal.App.3d at p. 874 ["If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (italics omitted)]; *In re Michael G.* (2012) 203 Cal.App.4th 580, 595 [appellate review for substantial evidence " 'accept[s] the evidence most favorable to the

---

[8] The City points out that Rodriguez filed his respondent's brief one day late after having received time extensions twice. Under the California Rules of Court, if a respondent's brief is not filed within the period granted by an extension, this court may impose the sanction of excluding the respondent's brief from consideration and deciding the appeal based only on the record, the appellant's opening brief, and any oral argument by the appellant. (Cal. Rules of Court, rule 8.220(a), (c), (d).) Here, we have elected to consider the respondent's arguments.

15

order as true and discard[s] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact' "].)

The trial court explained the basis for its determination in an oral, tentative ruling at the October 2011 hearing: "[A]fter reviewing all of the records and considering the arguments of counsel, I do believe that Mr. Rodriguez was substantially incapacitated due to his posttraumatic stress syndrome when he retired in 2007. I think that Dr. Snyder's second report, the credibility of his opinions in his second report were undermined by the fact that he did change his opinion. I think that the basis for his change of his opinion with respect to Mr. Rodriguez earning money from being involved in real estate, earning money from creating a corporation where he managed real estate and sold real estate during 2007 with his family members and managed some rental properties and then service on a nonprofit board, I don't believe that those job functions were inconsistent or demonstrated that the work history that was told by Mr. Rodriguez at the time that he was initially interviewed by Dr. Snyder are of such a significant level that would justify the change of his opinion. [¶] And so based upon this Court's independent review of the evidence, . . . I believe that the conclusions and opinions that were stated by Dr. Snyder initially reflecting that his work as a police station duty officer triggered his posttraumatic stress syndrome and that it was because he was in fact suffering from posttraumatic stress syndrome as provided by both Dr. Snyder and Dr. Cornell in his initial report, that he was substantially incapacitated due to his posttraumatic stress syndrome at the time of his resignation, and so that would be the finding of the Court."

### 1. *Substantial Evidence Supports the Trial Court's Determination*

While "substantial evidence" " ' "cannot be deemed synonymous with 'any' evidence" ' " (*Bowers*, *supra*, 150 Cal.App.3d at p. 873, quoting *People v. Bassett* (1968) 69 Cal.2d 122, 139) we find substantial support in the record for the trial court's findings, including that Dr. Snyder's change of opinion was entitled to little weight. Although the

trial court's statement of decision focused specifically on the reports of Dr. Cornell and Dr. Snyder, our review encompasses the entire record.  (*Bowers*, *supra*, at pp. 873-874.)

Substantial evidence supporting the trial court's determination includes Rodriguez's testimony about his combat experiences during the First Gulf War, the absence of military or other support services to help address the psychological impact of those experiences when he returned from the war, his assignments as a police officer that recalled many of his experiences during the war, and the fear, panic, and anxiety that manifested even while he worked in the modified police station duty officer position.

The testimony of Deputy Chief Sapone and of Deputy Chief Clark corroborated certain aspects of Rodriguez's story, such as his exceptional performance in his first years on the police force contrasted with his disappointing performance as a police station duty officer—which Deputy Chief Clark attributed to Rodriguez's lack of motivation and enthusiasm for non-field work, and his failure to disclose to anyone that he was suffering mentally.  Deputy Chief Clark testified that he was "very attuned to mental health issues that affect job performance" but observed nothing in Rodriguez's conduct that suggested psychological distress.  But Deputy Chief Clark supervised Rodriguez only until about 2002.  Consistent with Rodriguez's testimony about his detective assignment, his 2003 and 2004 performance reviews state that Rodriguez assisted in investigations of "numerous high priority cases including several homicides and gang shootings" and a "gang homicide."

Deputy Chief Sapone's correspondence with Rodriguez in October 2006, as part of the interactive process to negotiate his return to the police station duty officer position, illustrates Rodriguez's inability to provide any rational reason for his refusal to return to work, even though his doctors had cleared him for the modified position.  Deputy Chief Sapone wrote:  "During our conversation, you advised that you felt you could not perform the job duties due to the level of pain you are in on a daily basis.  You stated that your 'life is pain.'. . .  I asked you about the type of medications you take in order to get a

17

sense of possible impairment caused by medication. You weren't certain . . . . [¶] . . . I asked you if you were currently doing any secondary employment or selling real estate and you said no. . . . [¶] . . . [Y]ou did not provide us with any medical information regarding restrictions because of your medication, nor did you provide any documentation as to why you are unable to perform the essential functions of the Police Station Duty Officer." Deputy Chief Sapone testified that Rodriguez's failures to report to work or respond to messages that she left for him was "[o]ut of the ordinary" for a police officer.

The two reports by Dr. Cornell and the first report by Dr. Snyder offer an explanation for Rodriguez's conduct from a medical standpoint. In reviewing the medical opinion evidence, we are mindful of certain basic principles, which both sides contend support their position here. First, "[t]he value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed." (*Zuckerman*, *supra*, 189 Cal.App.3d at p. 1135.) A conclusion based upon "assumptions which are not supported by the record . . . , or upon factors which are speculative, remote or conjectural, . . . has no evidentiary value." (*Ibid*., citing *Hyatt v. Sierra Boat Co*. (1978) 79 Cal.App.3d 325, 338-339.) The trial court's acceptance of an expert's ultimate conclusion therefore must be predicated on "critical consideration" of the expert's reasoning and the facts relied upon. (*Zuckerman*, *supra*, at p. 1136; *People v. Bassett*, *supra*, 69 Cal.2d at p. 144 [" 'the opinion of an expert is no better than the reasons upon which it is based' "].)

Dr. Cornell relied on several sources of information about Rodriguez, including two in-person consultations, a half-hour conversation with Dr. Malis, and Dr. Bryant's report. Dr. Cornell described factors in Rodriguez's police service that contributed to the "escalation of [Rodriguez's] anxiety and discomfort." Dr. Cornell explained that "[o]ne of the most significant factors in understanding [PTSD] revolves around the intensive psychological distress at the exposure to internal or external cures [*sic*] that symbolize or

18

resemble an aspect of the primary event." Dr. Cornell addressed Rodriguez's failure to disclose his problems to the police department in terms of the psychological test results, which "confirm[] the self-medicating behavior" as well as "Rodriguez's need to present an image that diminishes the overt observation of the difficulty he may be experiencing." Dr. Cornell also reported that Dr. Malis told him that Rodriguez "minimized many of the difficulties he was having in therapy with her," which Dr. Cornell also found consistent with his conclusions.

In his October 2011 report, Dr. Cornell reviewed the police station duty officer job description. While Rodriguez's war experience was the primary trauma behind his PTSD, Dr. Cornell estimated that Rodriguez's police work was a 90 percent contributing factor due to the triggers that were activated, in particular by the narcotics enforcement and undercover work. Dr. Cornell opined that the police station duty officer role "suggests further hazards" due to the seriousness of Rodriguez's untreated disability and fact that "conscious as well as unconscious associative processes" can activate his " 'traumatic triggers.' " Dr. Cornell stated: "It is likely that any form of 'police work' would intensify [Rodriguez's] Post Traumatic Stress Disorder symptomatology."

Dr. Snyder drew similar conclusions in his first report, stating that Rodriguez "has had and currently has a psychiatric disability that precludes him from working for the Police Department." For this report, Dr. Snyder interviewed Rodriguez for two-and-a-half hours and reviewed the same material as Dr. Cornell, as well as extensive records from the police department documenting the efforts to communicate with Rodriguez and to establish an appropriate modified work environment in response to his claims based on physical pain. Dr. Snyder provided detailed examples of "stress events" during Rodriguez's service on the narcotics enforcement team and while undercover. Rodriguez reported to Dr. Snyder that by 2006, "when he knew he was being terminated," he was having daily " 'panic attacks' " during which "he feels as though he is 'dying.' His eyes 'puff up' and become dry. His heart rate increases, he sweats, he has

19

shallow and rapid breathing and he doesn't know what to do. He feels 'numb.' . . . He felt his only 'recourse was to figure out how to leave the Police Department.' "

Dr. Snyder also addressed the issue of Rodriguez's credibility, noting that "psychological problems in the police force were not mentioned" anywhere in the police records, that Rodriguez similarly failed to disclose his psychological problems related to police work to the Veterans Administration, and that "[t]he patient wasn't communicating to others that he was having these experiences," not even to his therapist. But after reviewing Dr. Bryant's report, Dr. Snyder concluded that Rodriguez's reasons for not telling anyone about his symptoms "fits quite well with the psychological test results of Dr. Bryant who noted that the patient is very concerned about maintaining a state of denial about his psychological problems." Dr. Snyder restated Dr. Bryant's finding that Rodriguez "was not fabricating or magnifying his symptoms and the testing clearly indicated that he was suffering from severe anxiety secondary to a Post Traumatic Stress Disorder and Generalized Anxiety Disorder."

Dr. Snyder concluded: "Working for the Police Department would expose the patient to external cues that do remind him of the dangers that he faced while working as a police officer, and the dangers that he faced while serving in Iraq, re-evoking the terror and anxiety that he experienced when involved in these life threatening situations." Dr. Snyder opined that Rodriguez was unable "to perform the duties of a Police Station Duty Officer because even such an environment provides a sufficient number of cues that provoke memories of disturbing events and stimulate the patient to develop anxiety."

We are not persuaded that the trial court unreasonably relied on the reports of Dr. Cornell and the first report of Dr. Snyder. Far from failing to engage in critical consideration of these reports—which the record shows expressed careful reasoning and were based on extensive evidence—the trial court instead found that Dr. Snyder's reasoning in his second report was flawed and not justified by the information contained therein. Thus, this is not a case in which the trial court improperly accepted an expert's

20

opinion "without any critical assessment of the reasoning employed and the assumptions relied upon." (*Zuckerman*, *supra*, 189 Cal.App.3d at p. 1136.)

### 2. *Substantial Evidence Does Not Support Dr. Snyder's Reversal of Opinion*

Dr. Snyder highlighted eight factual grounds for concluding in his second report that Rodriguez was not credible and therefore not substantially incapacitated from a psychiatric standpoint from working in a modified police station duty officer position.[9] These may be summarized as: (1) Rodriguez failed to disclose to Dr. Snyder his outside engagements in real estate, with RLX Corporation, and with the Central Coast Gang Investigator Association; (2) Rodriguez allegedly misreported to doctors that he was in narcotics enforcement during the time that he was a police station duty officer; (3) alleged inconsistencies between Rodriguez's statements to physicians and those in his November 2006 deposition taken in connection with his first disability retirement claim; and (4) Rodriguez's failure to disclose his psychological stress to the police department or his police work triggers to the Veterans Administration, and his unwillingness to work with the police department in its effort to identify an appropriate accommodation.

---

[9] The eight grounds expressed in Dr. Snyder's second report were: "[1] [Rodriguez] did not report to me that he was a real estate agent or that he made significant amounts of money while working as a real estate agent. [¶] [2] [Rodriguez] did not report to me that he created a company, RLX Corporation, and that he, therefore, had a second job that he was undertaking. [¶] [3] [Rodriguez] did not report to me that he was on the Board of Central Coast Gang Investigator Association. [¶] [4] [Rodriguez] reported to physicians while he was actually assigned to the police station as a Police Station Duty Officer that he was in Narcotics Enforcement. [¶] [5] [Rodriguez] did not disclose to the Veterans Administration the fact that he was suffering (if true) a Post Traumatic Stress Disorder as a result of his work experiences in the Police Department. [¶] [6] [Rodriguez] did not disclose to the Police Department that he was suffering from psychological problems as a result of PTSD. [¶] [7] [Rodriguez] demonstrated multiple inconsistencies between his statements to physicians and those in his deposition. [¶] [8] [Rodriguez] demonstrated, over a period of time, an uncooperativeness and an unwillingness to work with others in establishing a workable job situation in the Police Department (by not responding to communications, and by not attending meetings)."

21

On the basis of these apparent inconsistencies, Dr. Snyder reversed his opinion, noting the conclusions expressed in his first report were based on his assumption that the history Rodriguez had provided was credible. We find the trial court's assessment of the factual bases for Dr. Snyder's change of opinion as not inconsistent with the evidence presented by Rodriguez or "of such a significant level that would justify the change of [Dr. Snyder's] opinion" was reasonable in light of errors in Dr. Snyder's analysis and the indistinct relevance of Rodriguez's engagements outside of the police force to the evidence specifically linking his PTSD to police work at any level. Most important, in exercising its independent judgment, it was the trial court's " 'responsibility to weigh the evidence at the administrative hearing and to make its own determination of the credibility of witnesses.' " (*Rodriguez*, *supra*, 227 Cal.App.4th at p. 1451.)

### a. *Endeavors outside of the police force*

Dr. Snyder opined after reviewing the medical reports and findings of the ALJ in connection with the first disability retirement claim that Rodriguez was not being "straight forward" about his work capabilities. Dr. Snyder noted, for example, that Rodriguez apparently testified in his November 2006 deposition that RLX Corporation was "an investment and consulting company he started and developed over the prior two years" but testified at the administrative hearing on his first disability retirement claim that he had no current involvement with the corporation. Rodriguez also provided vague and seemingly evasive testimony at that administrative hearing, stating that he did not remember supervising or having a business relationship with certain individuals on his brokerage team and could not describe the tasks he had to perform for his real estate work. Dr. Snyder further noted that Rodriguez "was not credible with me as he did not indicate that he had been working as a real estate agent, nor that he was making a significant income as a result." And Dr. Snyder noted that a printout of the Central Coast Gang Investigator Association Web site listed Rodriguez as an advisory council member, though Rodriguez did not report that "job" to him.

22

Viewed in light of the entire record, the trial court's determination that "I don't believe those job functions were inconsistent" with Rodriguez's claims is supported by the evidence. Rodriguez testified that his real estate work afforded him "some relief or some sanity" from the triggers that arose through his police work. And though Rodriguez did not offer information to his medical evaluators about these endeavors, neither does it appear that the doctors who interviewed Rodriguez in connection with the second disability retirement claim asked him about work outside of the police force.[10] Since these medical evaluations all occurred between 2008 and 2011, and Rodriguez testified that he had had no engagement with real estate, RLX Corporation, or the Central Coast Gang Investigator Association since 2006 or 2007, this omission is unremarkable.

Furthermore, the trial court could have concluded that Rodriguez's testimony at the October 2011 administrative hearing was credible regarding his inability to recall basic details about these endeavors. Rodriguez testified that he understood his memory lapse was hard to believe: "Just trying to connect the dots, you know, even found out from the insurance—old insurance exchange, that I had increased my life insurance during that time, . . . [to] umbrella policies over millions of dollars. Bringing it all together I just think that I was—I was going insane during that time."

In addition, the medical evidence that Rodriguez's PTSD cues or triggers were tied to his *police work* was substantial. Dr. Cornell and Dr. Snyder both indicated that Rodriguez was susceptible to "exposure to internal or external cures [*sic*] that symbolize or resemble an aspect of" his wartime trauma and that "conscious as well as unconscious

---

[10] The City argues that Dr. Snyder's second report reads: "The patient denied any simultaneous or subsequent employment to his department job . . . . [¶] The patient is again not being straight forward. . . ." Read in context, however, this statement suggests that the denial occurred in 2003 between Rodriguez and Dr. Conrad, who interviewed Rodriguez and noted that he had a real estate license and was working at the time of the evaluation for a broker, and not as a result of any inquiry by Dr. Snyder into Rodriguez's work during those years.

associative processes" related to his police work can activate those cues or triggers. There is no evidence in the record—nor does Dr. Snyder suggest in his second report—that Rodriguez's PTSD should have similarly disabled him from engaging in non-police work. The trial court reasonably inferred that Rodriguez's ability to engage in real estate and other non-police work was not inconsistent with an inability to perform police work. Because we " ' "resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court" ' " (*Rodriguez*, *supra*, 227 Cal.App.4th at p. 1452), we decline to impose a contrary inference here.

### b. *Police station duty officer position*

Dr. Snyder emphasized in his second report that Rodriguez misreported to the doctors evaluating his first disability retirement claim that he was in "narcotics enforcement" when "he was actually assigned to the police station as a Police Station Duty Officer." The City concedes that this assessment by Dr. Snyder was erroneous because Rodriguez was assigned to the investigations unit as a narcotics and gang detective for at least a substantial part of his tenure as a police station duty officer. The City contends, however, that although Dr. Snyder was mistaken on this point, other evidence pertaining to Rodriguez's detective assignment supports Dr. Snyder's conclusion that Rodriguez was not substantially incapacitated from police work prior to his resignation. The City points to Deputy Chief Clark's testimony that Rodriguez was capable of fulfilling and even excelling at his detective assignment but did not apply himself because of his dissatisfaction with "light-duty" work.

We find that the trial court's conclusion is substantiated by the evidence here as well, given that Dr. Snyder was mistaken about Rodriguez misreporting the nature of his police station duty officer assignment. Although Deputy Chief Clark's testimony invites a contrary inference about Rodriguez's abilities during the time that he served as a police station duty officer (i.e., Rodriguez could have fulfilled the duties of the position but was not motivated and instead chose to exploit the option of a disability retirement), it does

24

not alter the body of medical opinion evidence supporting the trial court's finding that Rodriguez was suffering from PTSD while serving in the police station duty officer role. That the trial court could reasonably have reached a contrary conclusion based on Deputy Chief Clark's testimony does not alter the outcome here. (See *Bowers*, *supra*, 150 Cal.App.3d at p. 874 ["reviewing court is without power to substitute its deductions for those of the trial court"].)

### c. *Inconsistent testimony*

Dr. Snyder's second report recites several instances in which Rodriguez's statements to the doctors for his first disability retirement claim were apparently inconsistent with his deposition testimony. As both sides acknowledge, Rodriguez's deposition testimony is not in the record. Dr. Snyder's interpretation of that testimony primarily reflects statements in Dr. Conrad's medical reports, however, which are in the record. Dr. Conrad, an orthopedist, submitted five medical evaluations between 2003 and 2007 regarding Rodriguez's complaints related to his back, hand, and wrist pain. Dr. Conrad's first report from May 2003 noted that Rodriguez had left the questionnaire section about simultaneous employment blank, causing Dr. Conrad to be "somewhat surprised" when he learned through the deposition transcript and his subsequent interview with the patient that Rodriguez had a real estate license and worked with a brokerage. Dr. Conrad's January 2005 report stated that Rodriquez "was carefully questioned regarding his simultaneous job as a real estate agent" and found that work was "sporadic and non-intensive," though in a November 2006 report Dr. Conrad reported that Rodriguez acknowledged spending "6-15 hours per week" on real estate work.

The inconsistencies cited by Dr. Snyder thus primarily relate to issues already discussed, including Rodriguez's engagement in real estate work. While these inconsistencies might have been particularly relevant to Rodriguez's first disability retirement claim because they raised questions about his claimed inability to work as a police station duty officer due to physical limitations, their relevance here is more limited

25

to the issue of Rodriguez's credibility. The City asserts that it is apparent from his testimony at the October 2011 administrative hearing that Rodriguez did not disclose "obvious facts" pertaining to his outside employment and which "are adverse to his case and would show that he was very capable of handling all of the administrative aspects of his job" as a police station duty officer.

There is no evidence that the trial court failed to weigh these factors in considering Rodriguez's testimony at the October 2011 hearing, alongside the extensive administrative record—including Dr. Conrad's and other medical reports from Rodriguez's first disability retirement claim, as well as the first and second ALJ's credibility determinations. Once again, it was the province of the trial court to weigh the evidence from the administrative hearing and to make its own credibility determinations (*Rodriguez*, *supra*, 227 Cal.App.4th at p. 1451), which we find here were supported by substantial evidence.

### d. *Failure to disclose his psychological condition or cooperate with police department efforts to accommodate him*

Dr. Snyder's second report also cites Rodriguez's failure to disclose his psychological stressors as evidence that he was not credible and not substantially incapacitated by PTSD while at the police department. The City asserts that Rodriguez's failure to disclose his alleged PTSD symptoms cannot be reconciled with his willingness to disclose his physical pain and physical limitations, thus magnifying his credibility problem.

There is no dispute that Rodriguez did not disclose his psychological problems to anyone at the police department or in his personal life at that time. The extent of Rodriguez's failure to disclose his PTSD symptoms, as related to his police work, to the

26

Veterans Administration doctors is less clear.[11] But even assuming the fullest extent of Rodriguez's failure to disclose his police work-related symptoms to the Veterans Administration, Dr. Snyder's conclusion in his second report about Rodriguez's nondisclosures directly contradicts his specific treatment of the issue in his first report.

In the September 2011 report, Dr. Snyder noted his concerns about Rodriguez's credibility and reported that Rodriguez claimed he did not reveal his traumas at the police department, and his subsequent symptoms, because "he was desperately trying to suppress (repress) his memories of these events and not think about them. He was trying to 'numb' himself to the effects of these events and wished to keep his troubles and his worries that he was going 'crazy,' a matter of private concern and something that he managed himself." After reviewing the psychological test results in detail, Dr. Snyder concluded that Rodriguez's pattern of failing to report his problems was consistent with the psychological test results that showed Rodriguez experienced extreme anxiety and feared he was "going crazy," was "very concerned about maintaining a state of denial about his psychological problems," and moreover "was not fabricating or magnifying" his PTSD symptoms.

The evidence that Rodriguez was uncooperative and unwilling to find a workable job situation in the police department similarly found a possible explanation in Dr. Snyder's first report. In reviewing Dr. Berman's comments about Rodriguez's failure to

---

[11] Dr. Galloway's report indicates at least one instance of disclosure to the Veterans Administration, noting under the category "POST-MILITARY TRAUMA HISTORY" that Rodriguez had experienced a gunfight when he was a police officer, had problems when he smelled blood on the job, and "had guns pulled on him," including once by a 12-year-old boy. But as the City points out, when Rodriguez was awarded veteran's disability compensation beginning in January 2010, the report and disability rating do not reflect any PTSD arising out of or related to his prior employment with the Santa Cruz Police Department.

follow discipline and orders before being "fired from that job,"[12] Dr. Snyder noted in his first report that Rodriguez's "uncooperativeness may have been a manifestation of psychiatric problems." In his second report, Dr. Snyder does not address Rodriguez's lack of cooperativeness from a psychiatric standpoint, instead repeating only the fact of his uncooperativeness—which was well established in Rodriguez's self-reported medical history—and his own conclusion that "[i]n sum, despite the evidence that [Rodriguez] is not magnifying his symptoms on the psychological testing . . . , the overwhelming evidence is such that he is not credible."

Insofar as Rodriguez's failures to disclose his symptoms and failure to cooperate with the police department were addressed in Dr. Snyder's first report from a psychiatric standpoint as related to or possibly the result of Rodriguez's PTSD, we find Dr. Snyder's reference to these same behaviors as a basis for reversing his opinion in his second report to be unconvincing. The reasoning set forth in Dr. Snyder's second report simply does not substantiate this reversal. (See *Zuckerman*, *supra*, 189 Cal.App.3d at p. 1135.) We conclude that the trial court acted reasonably in assigning little weight to Dr. Snyder's second report.

### 3. *Substantial Evidence Also Supports the Disability Determination as it Relates to Timing and Job Duties*

The City raises two additional arguments in favor of reversal. First, the City contends that Dr. Cornell's reports do not discuss how Rodriguez is unable to perform the particular *administrative* tasks of the police station duty officer position, as opposed to

---

[12] Dr. Berman's follow-up evaluation of Rodriguez for purposes of his veteran's disability claim reports that Rodriguez "got fired from" his job as a police officer. Dr. Galloway's evaluation similarly reports that Rodriguez "was fired from [his police job] for not showing up for work and not following orders. . . ." The City argues these statements offer another example of Rodriguez providing false information to medical professionals, since he actually resigned and was not fired. Rodriguez's perception of his resignation, however, appears to be that he actually lost his job because he was about to be fired, which is supported by the record and the testimony of Deputy Chief Sapone.

police work generally. The City points to Rodriguez's two-week return to the police station duty officer position in late March 2007, at which time he performed various administrative functions such as data entry of police reports and phone calls with the public about crime or incident reports, as an example of the administrative tasks that Rodriguez could fulfill.

This argument fails to address the impact of Dr. Cornell's opinion about any type of police work, which necessarily includes administrative tasks performed at the police station. Before reversing his medical opinion in the second report, Dr. Snyder also had concluded that *any* work for the police department was likely to trigger Rodriguez's PTSD. Dr. Snyder opined, "Working for the Police Department would expose the patient to external cues that do remind him of the dangers that he faced while working as a police officer, and the dangers that he faced while serving in Iraq, . . . . Any such exposure would, and does, stimulate a worsening of his symptoms . . . ." Rodriguez's testimony at the administrative hearing was consistent with the doctors' conclusions on this point. Rodriguez testified that the sound of a siren, the sight of a police car, police in uniform, and talk of police work were triggers that would cause him to have panic attacks.

The evidence also shows that Rodriguez's two-week return to work in 2007 was fraught with problems. A letter from Deputy Chief Sapone to Rodriguez dated May 7, 2007, reviewed this brief period and noted, for example, that "in three days you received documented oral counseling for failing to obey orders and/or policy" and that only a week later, Rodriguez "left work" without following protocol or even updating his time card or his immediate supervisor. This contrasts sharply with Deputy Chief Sapone's testimony that prior to late 2006, when Rodriguez first failed to return to work, she was not aware of any incidents in which Rodriguez had refused to perform assigned work or violated department rules or administrative directive. Rodriguez's stated reason for going home at the time was that he was "in extreme pain" and needed "to go home and take my prescribed medications . . . ." Rodriguez's testimony at the administrative hearing,

29

however, suggests that his inability to perform the required tasks were as much a result of "mental pain" as physical pain, though he did not understand that at the time.

We find the sum of this evidence supports the trial court's finding that Rodriguez was substantially unable to perform any aspect of the police station duty officer position, including the administrative tasks. The same body of evidence supports the finding that Rodriguez was unable to perform his job duties at the time that he resigned from the police department. The City's second argument, contending that substantial evidence does not support a finding that Rodriguez was disabled *on or before* he left the police department in June 2007, as statutorily required for eligibility for a disability retirement (Gov. Code, § 21154, subd. (d)), thus fails on the evidence in the record.

## III. DISPOSITION

The judgment is affirmed.

30

_____
Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Grover, J.


Rodriguez v. City of Santa Cruz et al.
H042280